In re TE.L., To.L., J.G., K.P., Jr., Ty.L.;

T.L. and M.L., Appellants.

Nos. 02–FS–560 to 02–FS–563, 02–FS–578, 02–FS–615 to 02–FS–617, 02–FS–630, 02–FS–674, 02–FS–745, 02–FS–746, 02–FS–760, 02–FS–761, 02–FS–773.

District of Columbia Court of Appeals.

Argued Dec. 11, 2003.
Decided Feb. 19, 2004.

Lauren S. Kahn, McLean, VA, appointed by the court, for appellant T.L.

Kelli J. Jareaux, appointed by the court, for appellant M.L.

Mary L. Wilson, Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, were on the brief, for respondents.

Before TERRY, SCHWELB, and WASHINGTON, Associate Judges.

SCHWELB, Associate Judge:

Appellants T.L. and M.L. are husband and wife. The respondents are Mrs. L.'s five children, three of whom were fathered by Mr. L.; the other two respondents are Mr. L.'s step-children.[1] Following an evidentiary hearing, the trial judge found that all five respondents have been neglected within the meaning of D.C.Code § 16–2301(9)(B) (2001) (hereinafter (B)), which defines a neglected child, in pertinent part, as a child who is "without proper parental care and control ... necessary for his or her physical, mental, or emotional health." The adjudication of neglect was based entirely on serious, disabling, and unexplained injuries suffered in Mr. and Mrs. L.'s care by Ch.H., a boy then six years old who is not the son of either appellant[2] or the sibling of any of the respondents, and who was spending the summer at the home of Mr. and Mrs. L. Specifically, the trial judge found that the respondent children were "in imminent danger of abuse" because "their parents [sic][3] subjected a child believed to be their sibling to cruelty, torture and chronic abuse." The judge ordered that the three younger respondents, who had previously been removed from Mr. and Mrs. L.'s home, be committed to the custody of the Department of Human Services (DHS), and that the two older children be placed with their father, K.P., Sr., under the protective supervision of the court.

---

1. The five respondents are the following:

| Child | Sex | Date of Birth |
| --- | --- | --- |
| J.G. | Female | October 21, 1992 |
| K.P., Jr. | Male | September 27, 1994 |
| Te.L. | Female | November 23, 1996 |
| To.L. | Male | September 10, 1998 |
| Ty.L. | Male | September 28, 2001 |

Appellant T.L. is the father of the three younger children; K.P, Sr., is the father of J.G. and of K.P., Jr.; Ty.L. was born approximately one month *after* his siblings and half-siblings were removed from the home.

2. Ch.H. was apparently believed by all concerned to be the son of T.L. After this neglect proceeding was instituted, however, DNA testing established that Mr. L. is not Ch.H.'s father.

3. As previously noted, Mr. L. is the stepfather, rather than the biological father, of J.G. and K.P., Jr.

Both Mr. and Mrs. L. have appealed to this court from the adjudication of neglect.[4] They point to the lack of any evidence (or finding) that any of the five respondents had been without proper parental care within the meaning of (B). They argue that D.C.Code § 16–2301(9)(E) (2001) (old (E)), which was in effect at the time of the evidentiary hearing, included in the definition of a neglected child one who "is in imminent danger of being abused . . . and *whose sibling has been abused,*" that the case was initially brought pursuant to this provision, and that Ch.H., the child who was found to have been abused, is not respondents' sibling. Appellants claim that old (E) therefore does not apply, and that the District has attempted to use (B) as a proxy for, and to fill lacunae in, old (E).

For the reasons stated below, we are in substantial agreement with the appellants' contention that the District did not prove a violation of (B). We must therefore vacate the trial court's order. Much time has passed since the trial judge's decision, however, and we do not know the present circumstances of the respondents or of Mr. and Mrs. L. Moreover, in 2003 the definition of a neglected child in old (E) was expanded to cover a situation such as the one presented here. The statute, as amended, now defines a neglected child as including, *inter alia,* one "who is in imminent danger of being abused and another child *living in the same household or under the care of the same parent, guardian or custodian* has been abused." *See* D.C.Code § 16–2301(9)(A)(v) (Supp.2003) (emphasis added), to which, for convenience of comparison with "old (E)," we shall refer to as "new (E)." Any future order affecting the disposition of the respondents must be consistent with new

(E). We also note that, under new (E) as under old (E), the abuse of one child in a household does not *automatically* mean that other children in the household are in "imminent danger" of abuse.

Accordingly, we remand the case to the trial court for further proceedings consistent with this opinion, and we direct that the court take into consideration all relevant factual and legal developments since its orders were entered.

## I.

### FACTUAL BACKGROUND

A. *The mistreatment of Ch.H.*

By the time his plight was brought to the attention of the police on August 22, 2001, Ch.H. had suffered, at the hands of adults, mistreatment which can fairly be characterized as horrifying. Prior to May of that year, Ch.H. had been living with his mother, Ms. T.H., his mother's boyfriend, and his siblings. Ch.H. was a bed wetter, a condition that apparently irritated adults who were in charge of him. The mother subsequently stipulated that she had neglected Ch.H. and her other children by failing to protect them from her boyfriend. Although the mother testified that the boyfriend had merely slapped Ch.H. with his hand, the uncontradicted medical evidence showed that Ch.H. had numerous scars on his back which were probably attributable to cigarette burns. The date when these burns were inflicted is uncertain, but the scars were old enough to suggest that these injuries may have occurred when Ch.H. was still in his mother's care, and the District so alleged in a neglect petition directed against the mother.

In May 2001, Ch.H. went to stay with Mr. and Mrs. L. for the summer. At that

---

4. Mrs. L. has also appealed from the disposition order committing the children. There are thus three appeals with respect to each child, for a total of fifteen appeals.

time, he, his mother, and Mr. L. all apparently believed that Mr. L. was Ch.H.'s father. In fact, Ch.H.'s mother testified that Ch.H. was looking forward to visiting his "daddy." Unfortunately, the boy's experiences at the home of Mr. and Mrs. L. did not bear out his optimistic expectations.

On August 22, 2001, Mr. and Mrs. L. brought Ch.H. to Greater Southeast Hospital. Mr. L. identified himself as Ch.H.'s father. The boy was unconscious, and he had many straight and looped welts, bruises, and lacerations on his legs, buttocks, arms, chest, ribs, waist, back, and on the soles of his feet. He had a wide open gash on his forehead, and another injury that had formed a scab on top of his head. Police detectives were informed of the situation. The explanation of Ch.H.'s condition provided to the detectives by Mr. and Mrs. L.—that Ch.H. had fallen off Mrs. L.'s back during a game of "horsey," that he had struck his head in another fall, and that he had been bitten by the family's young female pit bull—seemed to the officers to be incredible and insufficient to explain the boy's numerous injuries. One of the officers perceived the injuries to be so severe that he did not believe that Ch.H. would survive. Mr. and Mrs. L. admitted that they had not previously sought medical care for Ch.H. for the dog bite (because the dog had received all of her shots) or for any of his other injuries.

In light of the seriousness of Ch.H.'s condition, the boy was transported to Children's Hospital Medical Center, where he was placed in intensive care. Upon his arrival, he was comatose and appeared to be undernourished. Hospital personnel had to provide Ch.H. with a ventilator to assist him in breathing.

At Children's Hospital, Ch.H. was examined and treated by Allison McCarley, M.D., a board-certified pediatrician. Dr. McCarley testified as an expert witness at the evidentiary hearing. She counted a total of forty-three straight and looped lacerations over Ch.H.'s body, all consistent with the boy's having been beaten intentionally with an electrical cord or belt. These injuries, according to Dr. McCarley, were not of the kind that could occur accidentally, and although the evidence on this point might be clearer, she indicated (and the trial judge found) that most or all of these injuries were recent and were probably incurred during the period that Ch.H. was staying with Mr. and Mrs. L.

In addition to the beatings and whippings that left the lacerations, Ch.H. suffered serious internal injuries. A CAT scan revealed that Ch.H. had sustained acute, fresh bleeding on the top of his brain; Dr. McCarley testified that this injury was less than a week old. The boy had also suffered retinal hemorrhages (or bleeding) in both of his eyes. These injuries, according to Dr. McCarley, were caused by severe shaking and trauma, and they could not have occurred accidentally or from playing "horsey." Dr. McCarley acknowledged that some of Ch.H.'s injuries were consistent with a fall.

Ch.H. remained on a ventilator for fourteen days, and in intensive care for three weeks. He was then moved to the Hospital for Sick Children, where he was apparently still a patient at the time of the evidentiary hearing. As a result of the bleeding of his brain, Ch.H. has suffered visual impairment and cognitive delay. His mother testified that when she last visited Ch.H. at the Hospital for Sick Children in February 2002 (more than two months before the hearing), he was in a wheelchair, apparently unable to walk or even to talk normally. Before his stay with the L. family, according to the mother, Ch.H. was "really motivated." He at-

tended school, and he liked to watch cartoons and to play with his toy cars.

## B. *The proceedings in the trial court.*

On the day that Ch.H. was taken to Greater Southeast Hospital, officers went to Mr. and Mrs. L.'s home and removed the couple's four-year-old daughter, Te.L., and their two-year-old son, To.L.[5] The children were examined, but no evidence of physical abuse was discovered. Both children, and especially the boy, were unruly and somewhat aggressive. James M. Evans, Jr., a clinical social worker who was qualified as an expert witness, diagnosed the children as suffering from "adjustment disorder." He testified that the children's behavior was consistent with that of abused children, but that it could also have been the result of their separation from their parents.

Ty.L., the youngest child of Mr. and Mrs. L., was born on September 28, 2001, more than a month after Ch.H. was hospitalized. Ty.L. was removed from the home on November 1. The youngster was found to be dirty, he suffered from diaper rash, and he had some wax in his ear. The social worker in charge of his case, Amy Robinson, acknowledged, however, that Ty.L. was taken from his parents because he was thought to be a sibling of Ch.H., ("[t]hat was the belief at the time, yes"), and not on account of imperfect hygiene or diaper rash or ear wax.

The District of Columbia filed child neglect petitions with respect to each of the five respondents pursuant to old (E). The District emphasized the severity of the injuries to the children's supposed sibling and the consequent alleged danger to the respondents' own safety. After it was determined that Mr. L. was not in fact Ch.

H.'s biological father, and that the respondents therefore were not the boy's siblings, the District added an allegation, purportedly pursuant to (B), that, in the absence of state intervention, each of the respondents would continue to live with the adults who were responsible for the abuse of Ch.H. The District alleged that because of "the sheer number ... and permanency of [Ch.H.'s] injuries" inflicted while he was residing with the appellants, each of the other children in the household was "without proper parental care for his [or her] emotional health."

An evidentiary hearing on the District's petitions was held from April 29 through May 3, 2002. The children's Guardian *ad Litem* (GAL) supported the District's position. Because Mrs. L. was arrested following the discovery of Ch.H.'s condition, and in light of apparent Fifth Amendment concerns, neither she nor Mr. L. testified.[6] The court heard testimony from two social workers, two police detectives, the father of the two older children, the mother of Ch.H., and Dr. McCarley.

Although it was readily apparent from this court's decision in *In re M.W.*, 756 A.2d 913 (D.C.2000), that a petition pursuant to old (E) was not maintainable if the abused child was not the respondents' sibling, the trial judge conducted the evidentiary hearing as though the District had brought an (E) case, not a (B) case. When the GAL, supported by the Assistant Corporation Counsel, sought to introduce evidence from the two older children to show that excessive discipline had been imposed in the L. household, the judge did not admit the proffered testimony:

THE COURT: No. The children will not testify. Their testimony is not relevant.

---

5. Mrs. L.'s two older children were spending the summer with their father.

6. Ultimately, no criminal charges were brought against Mrs. L.

*The issue here is what happened August 22nd involving [Ch.H.].*

MS. MITCHELL (COUNSEL FOR THE DISTRICT): Your Honor . . . .

THE COURT: Ms. Mitchell, I'm ruling. This is not subject to debate, discussion or dispute.

Subsequently, the judge reiterated that

we're deciding whether or not the [respondent] children are deemed neglected under the law of the District of Columbia based upon what happened while [Ch.H.] was in their parents' care.[7]

At the conclusion of the evidentiary hearing, the judge held, citing our decision in *M.W.*, 756 A.2d at 914-17, that the District had not proved its case under old (E) because Ch.H. was not the respondents' sibling. He ruled for the District, however, on its claims under (B). As we have previously noted, the judge's conclusion that the respondents were neglected within the meaning of (B) was based solely upon his finding that they were all in imminent danger of abuse because Ch.H. had been subjected to mistreatment and torture by Mr. and Mrs. L. This was the precise reasoning that would have been called for if the respondents had been Ch.H.'s siblings and if the cases could have been brought under old (E).

## II.

## LEGAL ANALYSIS

A. *The applicability of (B).*

■ At the time that this case was tried, our neglect statute contained a general provision defining a neglected child as one "without proper parental care or control . . . necessary for his or her physical, mental, or emotional health." D.C.Code

§ 16–2301(9)(B). This provision did not address or even mention the specific circumstances under which one child could properly be found to be neglected on the basis of the abuse of a different child. But the neglect statute also had a provision— old (E)—which focused directly on the foregoing problem. Old (E) provided that a finding of neglect under this theory may be made if, and therefore only if, the respondent is "in imminent danger of abuse, and if [his or her] *sibling has been abused.*" (Emphasis added.) We held in *M.W.*, 756 A.2d at 915-16, that the word "sibling" must be accorded its plain and customary meaning, and that a cousin living under the same roof with the respondent was not a "sibling."

The District's attempt to apply (B) to the circumstances before us is replete with difficulties. As we reiterated only a few months ago, "[t]his court has often recognized the well-settled rule of statutory construction that a special statute covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms." *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 831 A.2d 921, 943 n. 18 (D.C.2003). Here, it was old (E) that covered the "particular subject matter" and required that, in situations of this kind, the respondent may be found to be neglected only if he or she is a sibling of the abused child. It would be incongruous to suppose that by enacting a general provision like (B), the legislature intended to dispense with the "sibling" requirement and to authorize a finding of neglect even if the respondent was *not* a sibling of the victim of the abuse.

---

7. In fairness to the judge, we note that the District's amended petition focused primarily, though not exclusively, on the events of August 22, 2001, and entirely on the mistreatment of Ch.H.

■ Moreover, if we were to accept the District's contention that (B) covers the situation before us, then old (E) would become altogether superfluous. There would have been no need for the legislature to enact old (E), for according to the District's logic, (B) covered everything that was addressed by old (E) (as well as situations, such as this one, excluded from old (E)). But "[a] basic principle of statutory construction is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." *Veney v. United States,* 681 A.2d 428, 433 (D.C.1996) (en banc) (quoting *Thomas v. District of Columbia Dep't of Employment Servs.,* 547 A.2d 1034, 1037 (D.C.1988)) (brackets omitted). "We are not prepared to read [ (B) ] in a manner which treats [old (E)] as if [it] did not exist." *Veney,* 681 A.2d at 433.

■ In this case, the District seeks to read old (E) out of the neglect statute. It is true that this statute "is remedial and [is] thus to be liberally construed to achieve that end." *M.W.,* 756 A.2d at 916 (citation and internal quotation marks omitted). The District's position that the general terms of (B) trump the specific limitations in old (E), however, is not "liberal construction, but reconstruction." *See Adjei v. District of Columbia Dep't of Employment Servs.,* 817 A.2d 179, 184 (D.C. 2003). "It is not within the judicial function ... to rewrite the statute, or to supply omissions in it, in order to make it more fair ...." *1841 Columbia Rd. Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 306, 308 (D.C. 1990).

In *M.W.,* the court stated that

it is debatable in any case whether the District has only § 16–2301(9)(E) at its disposal when confronting neglect based primarily on abuse of other children in the household.

756 A.2d at 917. The court cited and summarized (B) immediately after the quoted observation. The court did not decide the question that it raised, so that *M.W.* does not constitute precedential authority with respect to the point under discussion. But even if we were to assume, *arguendo,* that the court in *M.W.* envisaged an affirmative answer to the question it characterized as debatable—and such an assumption would indeed be a bold one—the court surely did not have in mind a case which was tried, as this case was, exclusively (and not just primarily) on an (E) theory. Unlike old (or new) (E), (B) focuses solely on the care and treatment of the respondent, and makes no mention at all of any other child. In the present case, on the other hand, the court's entire inquiry was directed at the abuse of Ch.H., and little or no testimony was heard or even permitted as to the treatment by Mr. and Mrs. L. of any of the respondent children. The judge heard nothing, for example, about the degree of bonding, if any, between the respondents and Mr. and Mrs. L., or regarding any emotional harm that separation from their parents might entail. The preferences of the two older children in the matter are likewise unknown. Indeed, the judge was emphatic in his insistence that any inquiry beyond the torment inflicted upon Ch.H. was outside the scope of the case, and he excluded testimony relating to the manner in which Mr. and Mrs. L. disciplined other children. Nothing in the *M.W.* opinion can fairly be construed as contemplating that a(B) case may be proved in this way.

Our decision on this issue is fact-bound, and we need not and do not decide that (B) may *never* be invoked as a basis for finding that abuse of one child constitutes neglect of another. In situations such as this, we should rarely, if ever, say never,

for "the future may bring scenarios which prudence counsels against resolving anticipatorily." *Florida Star v. B.J.F.*, 491 U.S. 524, 532, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989); *see also Pope v. United States*, 739 A.2d 819, 827 n. 19 (D.C.1999). If, for example, a father were to blind or maim a neighbor's child in front of his family, for the purpose or with the effect of terrifying and mentally torturing his own youngsters, the parent's treatment of his own children would surely constitute child abuse or neglect under any reasonable definition. But that hypothetical situation is not comparable to the circumstances before us. In the present case, the two oldest respondents were with their father and were not residing in Mr. and Mrs. L.'s home during much of Ch.H.'s stay there. There is no evidence that the four-year-old and the two-year-old witnessed the boy's abuse or even knew of it. The youngest respondent had not yet been born. On such a record, and viewing the evidence in the light most favorable to the District, *In re S.G.*, 581 A.2d 771, 774 (D.C.1990), we are constrained to hold that the District did not prove what it must prove in a(B) case, namely, that *any of the individual respondents* was without proper care and control within the meaning of (B).

**B.** *Factual and legal developments since the trial court's decision.*

■ Because the District failed to prove its case under (B) or old (E), we conclude that the order removing the respondent children from the home of Mr. and Mrs. L. was in violation of then-existing law, and we must therefore vacate that order and remand the case to the trial court. Much time has passed, however, since Ch.H. was brought to the hospital and since the trial judge issued his decision. During that time, the facts have changed and the law has changed. We must therefore remand the case to the trial court in order to

enable the judge to take into consideration these new developments; any new order cannot be based upon a stale record.

The trial court ordered in 2002 that two of the respondents were to live with their birth father under the protective supervision of the court. The three younger children were committed to the custody of DHS and, presumably, they were placed in foster care. The record before this court does not reveal whether these arrangements are still in place and, if so, whether they have proved to be in the best interests of any or all of the children. We likewise have no information regarding whether there has been any contact between the respondents and Mr. and Mrs. L. and, if so, whether such contact has been sufficiently fruitful to make reunification a potentially appropriate disposition.

As we have already noted, there has also been a significant change in the law since the trial judge announced his decision. In 2003, old (E) was supplanted by new (E). The new statute defines a neglected child as including one who is "in imminent danger of abuse" if another child "living in the same household under the care of the same parent, guardian or custodian has been abused." D.C.Code § 16–2301(9)(A)(v) (Supp.2003). In other words, a respondent may now be a "neglected child" even if the child in the same household who has been abused is not his or her sibling. If new (E) had been in effect when this case was decided, then the decision of the trial judge would have been a permissible application of the then-controlling statute.

Because the orders removing the children from Mr. and Mrs. L.'s home were not authorized either by old (E) or, as we have now held, by (B), the appropriate (though perhaps painful and difficult) disposition at that time, at least in the absence of unusual circumstances not known to us, was to order that the respondents be

returned to the custody of Mr. and Mrs. L. Two years later, a reflexive reaction to the situation presently confronting this court would be to order now what should have been ordered then, *i.e.,* that the children be returned to their mother and father/stepfather. For several reasons, however, we believe that such a disposition would be premature and would not properly take into account the best interests of the children as they may be affected by new facts and new law.

Aside from the enactment of new (E), it is possible that events since the trial court's order may have made return of the respondents to the appellants inappropriate. The older children, for example, may have become so accustomed to living with their father that another change in custody would disrupt their lives and be contrary to their best interests. There may likewise have been developments in the lives of the three youngest children which would affect the appropriate disposition of their cases. Moreover, the circumstances of Mr. and Mrs. L. may not have remained static, especially in light of the drastic changes in their lives effected by the trial court's decision (and, indeed, by their own conduct).

 Any future orders must also take into account new (E), which applies, at the very least, to any disposition of the children effected after August 22, 2002, which was new (E)'s effective date.[8] If the respondents were to be placed, in 2004, with Mr. and Mrs. L., they, (1) might be in imminent danger of being abused; and (2) would live in the same household as Ch.H., who had been abused in that household. Thus, if the judge's 2002 finding that the children were in imminent danger holds true in 2004, then the respondents would potentially come under the literal terms of new (E). If the judge were to find imminent danger in 2004, then the respondents' return to Mr. and Mrs. L. would be improvident and futile for, upon their arrival at appellants' home, they would become neglected children within the meaning of new (E). The judge will therefore have to make new and updated findings of fact and order a disposition (with respect to each child) that is consistent with the law now in effect. Accordingly, we conclude that a remand is necessary in order to permit the judge to take into consideration the factual and legal developments that have occurred since his original decision. *See In re C.T.,* 724 A.2d 590, 599–600 (D.C.1999) (remanding case with directions to explore intervening developments).

### C. *The remand.*

Our conclusion that new (E) may properly be applied to the determination

---

8. In light of our focus on the *prospective* effect of new (E) on possible *future* actions by the trial court, we need not decide the applicability here of the doctrine that "an appellate court must apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Speyer v. Barry,* 588 A.2d 1147, 1155 (D.C.1991) (quoting *Bradley v. Sch. Bd. of City of Richmond, Va.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)); *see generally United States v. The Schooner Peggy,* 5 U.S. (1 Cranch.) 103, 110, 2 L.Ed. 49 (1801). Under that doctrine, the appellate court may "affirm a judgment that was erroneous at the time, where the law has been changed in the meantime and where such application of the new law will impair no vested rights under the prior law." *Fulton County v. Spratlin,* 210 Ga. 447, 80 S.E.2d 780, 781 (1954) (quoting *City of Valdosta v. Singleton,* 197 Ga. 194, 28 S.E.2d 759, 767 (1944)). There is sometimes tension between these authorities and the proposition that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (footnote omitted).

whether the respondents are to be returned to the home of Mr. and Mrs. L. suggests, at first blush, that the results of a remand are preordained. There can be no doubt that the evidence of abuse of Ch.H. was compelling. At least at the time of his original decision, the judge could reasonably find, on the limited record before him, that children who were living with parents who had so cruelly mistreated and injured Ch.H. were in serious, and perhaps even imminent, danger of harm. Moreover, if the judge was prepared to find neglect within the meaning of (B), which has at most an indirect and implicit connection with the conduct here at issue, we suppose that unless the circumstances have materially changed since his order was entered, he would be more or less certain to find, *a fortiori*, that new (E), which deals directly and explicitly with the type of scenario before us, precludes the respondents' return to Mr. and Mrs. L.

There can be no doubt that the mistreatment of Ch.H. must be a *major* consideration in the future disposition of this case. The actions of Mr. and Mrs. L. (or perhaps of Mr. *or* Mrs. L.) were extreme, and the injuries inflicted upon Ch.H. were very serious; the abuse did him permanent harm. But the case was tried by the judge on the apparent assumption that the mistreatment of Ch.H. was the *only* fact to be considered in determining whether the respondents were neglected children who should be removed from the home of their mother and father (in three cases) and mother and stepfather (in two). This assumption is unsound as a matter of law, and so restricted a focus is not in the best interests of the children.

We previously addressed old (E)—which, in regard to the issue now under discussion, is indistinguishable from new (E)—in *S.G.*, 581 A.2d 771 (D.C.1990). In that case, we emphasized the difficulty of the question with which a court is presented whenever the government seeks to remove one or more children from a parent's home because a different child has been abused. We synopsized the limitations of old (E) (which apply equally to new (E)) as follows:

> The term "neglected child" is defined in our statute as including a child "who is in imminent danger of being abused and whose sibling has been abused." D.C.Code § 16–2301(9)(E). The plain language of this provision requires the government, when it seeks to invoke this definition, to establish *both the abuse of the sibling and imminent danger to the child before a finding of neglect may be made.* The statute is thus incompatible with any notion that abuse of one sibling, *per se,* constitutes neglect of another.

*Id.* at 778 (emphasis added). We also recognized that

> one might plausibly argue that, if the stepfather did not abuse his own children before the discovery of his misconduct vis-a-vis S.G., there was no "*imminent* danger" that he would abuse them thereafter.

*Id.* at 780 (emphasis added).[9] In the absence of evidence that any of the four respondents who were alive at the time Ch.H. was mistreated had ever been abused, a finding that they were, or that newly born Ty.L. was, in *imminent* danger cannot be automatic.

Further, in *S.G.*, we reiterated that "the primary role of the parents in the upbring-

---

9. We added, however, that "this is a permissible rather than a mandatory inference for the trier of fact."

ing of their children" has now "been established beyond debate as an enduring American tradition." We quoted as follows from *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982):

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents....

*Id.* at 778. Moreover, the removal of a child from his or her home, however well-intentioned, does not come without cost to the child:

> [C]ontinuity of relationships is extremely important to children, and removing them from their families may cause grave psychological damage—damage which can be more serious than the harm intervention is supposed to prevent.

*Wald, State Intervention On Behalf of Neglected Children; A Search for Realistic Standards,* 27 STANFORD L. REV. 988, 994 (1975), quoted in *In re S.K.,* 564 A.2d 1382, 1390 n. 12 (D.C.1989) (concurring and dissenting opinion).

Children bond with adults, and especially with their parents. In this case, at the time that they were removed from appellants' custody, the four older respondents had apparently spent all or much of their lives in their mother's home and, so far as the admittedly truncated record reveals, they had done so without suffering any abuse. In *In re Hazuka's Adoption,* 345 Pa. 432, 29 A.2d 88, 90 (1942), the Supreme Court of Pennsylvania stated that it would be "ruthless beyond description" to remove a child from the home of loving prospective *adoptive* parents who had cared for the child for about two years. *See also In re L.W.,* 613 A.2d 350, 355 (D.C.1992) (quoting *In re Hazuka's Adoption*). If—and it is a big if—the evidence

in this case were to show that the respondents were well treated and cared for by Mr. and Mrs. L., the consequences of severing these children's ties to their parents would surely have to enter into the court's calculus. Indeed, Mrs. L. being the birth mother of all of the respondents and Mr. L. being the birth father of three of them, the Pennsylvania Supreme Court's stark terminology would apply *a fortiori.*

It may be that the removal of the five respondents from their home was necessary in order to protect them from harm of the kind that befell Ch.H. Indeed, the horrifying nature of Ch.H.'s mistreatment, as well as the number and character of his injuries, must be considered an important factor—perhaps the most important single factor—in the court's analysis, and this is true even though we do not know whether it was Mr. L., or Mrs. L., or both of them, who was responsible for the abuse. But removal of the respondents should not have been undertaken without full and explicit recognition of its potential costs to the emotional well-being of the children, whose world was being turned upside down and whose relationship with their parents was being disrupted in such a major way.

Our reading of the trial judge's decision, and of the record of the evidentiary hearing, suggests that if the judge considered these costs at all, he did so, at most, implicitly. The decision could (although perhaps need not) be understood as applying a *per se* rule that once a parent seriously mistreats one child, he or she, automatically or almost automatically, forfeits custody of his or her other minor children. In a case of abuse as extreme as that inflicted on Ch.H., contemplation of near-automatic forfeiture is not without superficial appeal. Nevertheless, such a notion oversimplifies the problem, it lacks balance, and it is foreclosed by our decision in *S.G.,* 581 A.2d at 778, in which we firmly

and explicitly rejected a *per se* rule. Rather, the court must be appraised of the "entire mosaic," *In re T.G.*, 684 A.2d 786, 788 (D.C.1996) (citations omitted), and must address the risks attendant on removing a child from his home as well as those involved in keeping the child where he or she is.

Almost two years have passed since the trial judge heard the case, and, as we have noted, the situation surely has not remained static. For example, some or all of the children may now have bonded with adults other than Mr. and Mrs. L. We reiterate that on remand, the trial judge will have to decide the case on the basis of the facts and law as they exist at the time of his ruling. We are, in any event, confident that the judge will give fair consideration to all relevant factors, including those enumerated herein, and will reach an updated disposition which protects and promotes the best interests of each of the five young respondents—innocent children whose lives have been so tragically affected by the unspeakable conduct of adults vis-a-vis another helpless and innocent child.

### III.

### CONCLUSION

For the foregoing reasons, the cases are remanded to the trial court for further proceedings consistent with this opinion.

 *So ordered.*[10]

---

10. Mrs. L. argues for the first time on appeal that she could not have neglected the respondents because she did not stand in *loco parentis* vis-a-vis Ch.H., the child found to have been abused. *See* D.C.Code § 16–2301(12) (Supp.2003). We conclude that she has not preserved this argument. *See S.G.*, 581 A.2d at 783–84; *D.D. v. M.T.*, 550 A.2d 37, 48

---

(D.C.1988). Moreover, Mrs. L. apparently believed, at the time the injuries to Ch.H. were found to have occurred, that she was his stepmother. For the reasons explained in *S.G.*, 581 A.2d at 784 n. 19, it would be incongruous to hold, under these circumstances, that Mrs. L. did not stand *in loco parentis* vis-a-vis her perceived stepson.