Kyle J. SAMPSON, Appellant,

v.

Elizabeth JOHNSON, Appellee.

Nos. 00–FM–183, 00–FM–
689, 00–FM–1697.

District of Columbia Court of Appeals.

Argued Feb. 24, 2004.
Decided March 25, 2004.

Susan H. Rosenau, Washington, for appellant.

Elizabeth Sarah Gere, Washington, with whom Christopher M. Ellis was on the brief, for appellee.

Before STEADMAN, SCHWELB and RUIZ, Associate Judges.

SCHWELB, Associate Judge:

■ Kyle J. Sampson, the father of Myriam Sampson, born December 18, 1998, has appealed from the following orders of the trial court:

1. an order dated February 17, 2000 (Order No. 1), in which the trial judge authorized Myriam's mother, Elizabeth Johnson, to move with the child to Portland, Oregon, and also ordered that visitation with Myriam by the father be suspended;

2. an order dated April 18, 2000 (Order No. 2), in which the judge denied a *pro se* motion, filed by the father, to modify custody and visitation in light of the change of circumstances brought about by the mother's move with Myriam to Oregon; and

3. an order dated November 2, 2000 (Order No. 3), in which the judge dismissed the action on *forum non conveniens* grounds.[1]

We conclude that the cumulative effect of these orders has been to deny the father both visitation with his daughter and a readily available forum in which the issues raised by this significant curtailment of his rights as a parent can be addressed. Denial of visitation rights to a parent is appropriate only in extreme cases in which such a measure is necessary to avoid harm to the child, and the trial judge made no findings which would support such a denial. We are unable to determine from the judge's findings whether the long-term denial of visitation was intentional and, if it was, what the judge's justification was for

---

1. Although technically there are three appeals pending, the father soon effectively abandoned his appeal from Order No. 1. Nine days after filing his notice of appeal, the father, acting *pro se*, moved in the trial court for modification of custody and visitation in light of the change in Myriam's residence authorized by Order No. 1, and it was in that court that the issues raised by that order have been litigated. In fact, both parties have proceeded in this case as though the appeal from Order No. 1 did not exist. In their briefs on appeal, each party has identified the matters before this court as being the appeals from Order No. 2 and Order No. 3. At oral argument, counsel for the father was not aware that an appeal had been taken from Order No. 1. Accordingly, the appeal from Order No. 1 must be dismissed for want of prosecution.

The pendency of the father's appeal from Order No. 1 did not undermine the trial court's authority to entertain either the father's motion to modify custody and visitation or the mother's motion to dismiss for *forum non conveniens* for, as detailed in the text below, both motions were based on a material change of circumstances. *See Stebbins v. Stebbins*, 673 A.2d 184, 190 (D.C.1996) (citing *In re S.C. M.*, 653 A.2d 398, 403 (D.C.1995)).

effectively denying the father any contact with his child. Accordingly, we vacate Order No. 2 and Order No. 3, and we remand the case for additional (and updated) findings of fact and conclusions of law and for appropriate disposition of the dispute consistent with this opinion and with the trial court's findings and conclusions on remand.

## I.

## THE TRIAL COURT PROCEEDINGS

### A. *Background.*

Mr. Sampson and Ms. Johnson were married near Portland, Oregon, in January 1998. During the first year of their marriage, the couple lived briefly in Qatar. Ms. Johnson then returned for several months to her former home in Oregon. In September 1998, she rejoined her husband, who had moved to Washington, D.C. Myriam was born in Washington on December 18, 1998.

In April 1999, when Myriam was approximately four months old, her parents decided to separate. On April 20, 1999, the mother filed a *pro se* complaint seeking custody of Myriam.[2] The mother also moved with Myriam to Fayetteville, North Carolina, to stay with her mother and stepfather.

The parties agreed, and the court ordered, that the mother would have custody of Myriam *pendente lite* and that there

would be weekly visitation with the father. On August 10, 1999, the judge signed a consent order which required each parent to travel to the other parent's home every second weekend. On October 27, 1999, the judge ordered that visitation was to proceed pursuant to a revised schedule. Under the new arrangement, the father was to travel to the mother's home three times a month, while the mother and Myriam were to visit the father once a month. The judge also ordered the father to pay $587 per month for Myriam's support.[3]

During the hearing on October 27, 1999, the father, who was at that time appearing *pro se*, expressed concern that the mother was planning to move with Myriam to the mother's original home in Oregon. The father orally requested "some type of restriction on [the mother's] taking the baby back to Oregon at this time, or moving the baby more than 500 miles from the District, without court permission." Upon ascertaining that the mother was contemplating a move to Oregon, the judge told the mother that she must obtain the court's permission before moving the child from her current home.

### B. *The mother's Motion for Temporary Relocation.*

In January 2000, the mother filed a Motion for Temporary Relocation, requesting that she and Myriam be permitted to move to Portland, Oregon, because the mother's own mother and stepfather (Myriam's ma-

---

2. The mother obtained *pro bono* counsel.

3. The father failed to appear on at least ten of the sixteen days on which he was scheduled to visit Myriam. This was apparently attributable, in part, to his unwillingness to drive long distances on Muslim holidays; according to the father, the mother agreed to the consequent suspension of visitation. See also note 22, *infra*.

The father claims to have made voluntary child support payments prior to the entry of

the support order, and he made a single payment of $500 in November of 1999. The mother instituted civil contempt proceedings to try to enforce the child support order, but the father failed to appear at the first scheduled hearing on the contempt motion on February 17, 2000, and subsequently no hearing on the motion was ever held. The trial judge has thus made no findings with respect to the father's ability to pay or, indeed, with respect to any issue relating to child support.

ternal grandmother and step-grandfather) were about to return to their home in that city. A hearing was held on the mother's motion on February 17, 2000. The father filed an opposition to the motion, but he did not appear at the hearing; he later explained that his plane from Dubai was delayed. The mother took the stand and described her extensive family connections and support in the Portland area, where she had lived since she was three years old. Although the motion was styled as one for "temporary" relocation, the mother made it clear during her testimony that she proposed to live in Portland indefinitely.

At the February 17 hearing, the father's attorney, who had previously filed a motion to withdraw, elected not to cross-examine the mother. The attorney did ask the court "to take into consideration [that] Oregon is a substantially longer distance from the District of Columbia than Fayetteville, North Carolina, and also [to] take into consideration the visitation." Counsel pointed out that, under the prior order, the mother was to bring Myriam to Philadelphia, where the father was apparently residing at the time, and she inquired "how the court intends to deal with that issue." The judge responded that "I'm going to vacate it," evidently referring to the visitation order, but she provided no further elaboration.[4] As events turned out, this cryptic exchange between court and counsel has resulted in the end of all contact between father and daughter for more than four years.

The judge formally ruled, *inter alia*, that "plaintiff may temporarily relocate to Portland, Oregon[,] with the minor child, M[y]riam Sampson," and that "all previ-ously scheduled visitation is hereby suspended." A brief written order implementing these rulings (Order No. 1) was issued later on the same day.

C. *The father's Motion for Modification of Custody and Visitation.*

Following the entry of Order No. 1, the father filed a motion for a stay of that order. On March 2, 2000, the trial judge denied the motion.[5] On March 22, the father appealed from Order No. 1, but as previously noted, he has never pressed this appeal. Instead, on March 31, 2000, the father filed what he termed a "Motion for Modification of Custody Caused by Change of Circumstances." The father alleged in his motion that Myriam's relocation would cause him hardship because he lacked the financial means to visit Myriam in Oregon. The father claimed that the move would interfere with his "opportunity to maintain a positive nurturing relationship with his child." He requested the court, *inter alia*,

to modify its visitation order to allow for the following:

If the temporary relocation to Portland, Oregon exceeds two months, th[e]n the [father] would be allowed visitation in the form of physical custody of Myriam for alternating two-month periods.

The father offered to pay for Myriam's transportation if the court adopted his proposal.

On April 18, 2000, in Order No. 2, the trial judge denied the father's motion on the following grounds:

For a party [sic] to modify a custody order, that party must demonstrate a

---

4. Counsel's response to the judge's statement was: "Okay. Very well, Your Honor."

5. The father also applied to this court for a stay of Order No. 1 pending appeal. On February 25, 2000, this court denied his application.

substantial and material change in circumstances and that such modification is in the best interest of the child. D.C.Code § 16–911(a–2)(4)(A). Due to Defendant's failure to show any substantial and material change in the child's circumstances, the Motion must be denied.

The judge thus evidently construed the motion as claiming that there had been a substantial and material change of circumstances since February 17, 2000, when Order No. 1 was issued. The father, on the other hand, was arguing that there had been such a change of circumstances *since the prior visitation arrangement* (which was based on the mother's residence in North Carolina and which predated Order No. 1) had been in effect. In any event, Order No. 2 left in place Order No. 1's suspension of the father's visitation rights.

D. *The mother's Motion to Dismiss or Stay Based on Forum Non Conveniens.*

On September 20, 2000, the mother filed a motion to dismiss the action or stay the proceedings pursuant to D.C.Code § 16–4507 (1997 Repl.).[6] The mother alleged, *inter alia*, that the father no longer lived in the District of Columbia,[7] and that he could not be reached at his last known address; that she alone was supporting Myriam; that the father was in arrears in the amount of $6,472 in his court-ordered child support; that Oregon had the most numerous and most significant connections to the dispute; that most of the persons with information relevant to any future custody determination were in Oregon; and that the cost of litigating the action in the District of Columbia would have negative consequences for Myriam. Meanwhile, the father filed various motions in which he requested visitation, asked that the child be made available for telephone conversations, and requested photographs of Myriam.[8] He wrote movingly regarding the pain that he had suffered as a result of his separation from his daughter, which by then had lasted more than a year. The father asserted that the mother had frustrated his attempts to develop a relationship with Myriam and that she had even declined to provide him with a telephone number at which his daughter could be contacted.

The father's motions were held in abeyance pending disposition of the mother's motion to dismiss or stay, and the trial judge never ruled upon them on the merits. On November 2, 2000, the judge issued a brief order (Order No. 3) dismissing the case on the grounds of inconvenient forum. The father filed a timely notice of appeal.

At the time that Order No. 3 was issued, D.C.Code § 16–4507(h) provided as follows:

6. This provision is no longer in effect, having been supplanted by D.C.Code § 16–4602.07 (2001). Under the new statute, an action may be stayed on inconvenient forum grounds only, *inter alia*, "upon condition that a child-custody proceeding be promptly commenced in another designated state...." D.C.Code § 16–4602.07(c). D.C.Code § 16–4604.02 (2001), however, provides (with less than luminous clarity) as follows:

A motion or other request for relief made in a child-custody proceeding or to enforce a child-custody determination which was commenced before the effective date of this chapter is governed by the law in effect at the time the motion or other request was made.

7. The consent order relating to visitation signed by the judge on August 10, 1999, provided that several of the child's visits to the father were to be in Philadelphia rather than in Washington, D.C.

8. It was the mother's position that, for religious reasons, she could not send photographs of Myriam to the father.

Upon dismissal or stay of proceedings under this section, *the Superior Court shall inform the court found to be the more appropriate forum of this fact* or, if the court which would have jurisdiction in the other state is not certainly known, shall transmit the information to the court administrator or other appropriate official for forwarding to the appropriate court.

(Emphasis added.) In addition, D.C.Code § 16–4507(e) provided:

If the Superior Court finds that it is an inconvenient forum and that a court of another state is a more appropriate forum, it may dismiss the proceedings, *or it may stay the proceedings upon condition that a custody proceeding be promptly commenced in another named state* or upon any other conditions which may be just and proper, including the condition that a moving party stipulate his or her consent and submission to the jurisdiction of the other forum.

(Emphasis added.) There is nothing in the record to suggest that the trial judge complied with § 16–4507(h), or, indeed, that this provision was brought to the judge's attention. Similarly, the judge did not condition dismissal on the institution of proceedings in Oregon, as authorized by § 16–4507(e). In any event, upon the entry of Order No. 3, no judicial authorization existed for visitation by the father. Moreover, because the District of Colum-

bia case had been dismissed, and because no proceeding had been brought in Oregon or elsewhere, there was no pending case in which the father could pursue his quest for visitation rights.[9] So far as we are aware, there has been no contact between father and daughter since.[10]

## II.

## LEGAL ANALYSIS

A. *The effect of the orders of the trial court.*

Although we are presented in this case with three separate appeals, the first of which has been abandoned, a realistic approach to the controversy requires us to consider the cumulative impact of the three orders on the principal issue before us, *i.e.,* whether what has turned out to be the effective extinction of the father's visitation rights may properly be sustained on this record.[11] In Order No. 1, the trial judge suspended the previous visitation regime, no doubt because arrangements based on the mother's residence in North Carolina simply did not fit the entirely new factual scenario—the mother and Myriam were to be living, at least temporarily and probably longer, in Portland, Oregon, some three thousand miles away. The judge did not, however, order any new visitation schedule. See Part I B, *supra.* As it turned out, the judge's suspension of visitation on February 17, 2000, had the

---

9. Theoretically, the father could have initiated proceedings in Oregon, but he apparently lacked the resources to do so. He also claimed that the mother had concealed Myriam's location from him. Moreover, the father's position, both in the trial court and on appeal, was that the case should continue to be litigated in the Superior Court.

10. We were advised at oral argument that the father has recently filed a motion in the trial court for visitation with his daughter, and that there is a possibility that visitation might

resume in the near future. In response to questions from the bench, counsel for the mother represented that she was prepared to inform the father of Myriam's whereabouts and to facilitate telephone contact between the father and Myriam.

11. Although the father has also requested that he and the mother have joint custody of Myriam, the principal focus of his argument has been that the suspension and long-term denial of his visitation was legally erroneous.

consequence, whether or not intended, of terminating contact between father and daughter for years to come. Although the father and Myriam were about to live a continent apart, the court's order contained no mechanism for visitation in the foreseeable future.

In Order No. 2, the judge declined to modify custody or visitation, concluding that there had been no material change of circumstances. The judge was obviously referring to the lack of any such change since the issuance of Order No. 1. The judge did not, however, compare the new scenario—mother and child in Oregon— with the previous situation—mother and child in North Carolina. Thus, although the father quite reasonably requested that a new custody or visitation arrangement be fashioned in order to accommodate the new reality, Order No. 2 left the situation as it was after the issuance of Order No. 1, without any provision made for visitation by the father. Moreover, the judge failed to comply with Super. Ct. Dom. Rel. R. 52(a), which requires the court to issue written findings of fact and conclusions of law when ruling upon a motion to modify a prior order of the court,[12] and the judge's statement in her written order that there had been no material change in circumstances did not reveal her reasoning with respect to the thorny visitation issue.

■ The problem was further compounded by the entry of Order No. 3, in which the judge dismissed the case on inconvenient forum grounds. Although the judge held no hearing on the mother's motion to dismiss or stay, and although she issued no formal findings of fact or conclusions of law,[13] it may well be, in light of the change in circumstances since the suit was initiated, that under a reasonable application of the standards set forth in D.C.Code § 16–4507 (1997 Repl.),[14] the

12. Rule 52(a) provides, in pertinent part, as follows:

> In all actions tried upon the facts the Court shall make written findings of fact, separate conclusions of law and judgment . . . and in granting or refusing interlocutory injunctions the Court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action . . . . Findings of fact and conclusions of law are unnecessary on decisions of motions under SCR–Dom. Rel. 12 or 56 or any other motion except motions to modify an order of the Court and except as provided in SCR–Dom. Rel. 50 [dealing with judgment of dismissal].

In fairness to the judge, it does not appear that any party requested written findings and conclusions.

13. In the absence of exceptional circumstances compelling the trial court to "make rulings off the cuff . . . in the press and urgency of a trial," *Beard v. South Main Bank*, 615 A.2d 203, 205 (D.C.1992) (per curiam) (quoting *Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979)), the judge should make findings of fact and conclusions of law before dismissing an action on inconvenient forum grounds. *Id.* We stated in *Beard* that "[o]ur review in this case is severely hindered by the trial court's failure to state on the record the reasons for its decision." *Id.* at 205.

14. Section 16–4507 provided in pertinent part as follows:

> (a) The Superior Court may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.

> . . . .

> (c) In determining if it is an inconvenient forum, the court shall consider if it is in the interest of the child that another state assume jurisdiction. For this purpose it may take into account the following factors, among others:
>   (1) If another state is or recently was the child's home state;
>   (2) If another state has a closer connection with the child and his or her family or with the child and [one] or more of the petitioners;
>   (3) If substantial evidence concerning the child's present or future care, protection,

District of Columbia had indeed become an inconvenient forum and Oregon had become a more appropriate one.[15] This would be especially true if, as the mother claimed, the father no longer resided in the District. Indeed, it appears that on February 17, 2000, eight months before the case was dismissed, the transfer of the case to Oregon was foreseen as necessary not only by the judge, but by the father's attorney as well.[16] By the time that the District of Columbia action was dismissed in Order No. 3, it was not at all implausible to conclude that Oregon had become a more appropriate forum.[17]

training, and personal relationships is more available in another state;

(4) If the parties have agreed on another forum which is no less appropriate; and

(5) If the exercise of jurisdiction by the Superior Court would contravene any of the purposes stated in section 16–4501, or any of the provisions of the Parental Kidnapping Prevention Act of 1980 (94 Stat. 3568).

15. A court may properly conclude that an initially appropriate forum has become inconvenient as a result of events that have occurred during the pendency of the litigation. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 26, cmt. g (1971), states that "[a] change in domicil[e] of the parties or other change in circumstances does not destroy jurisdiction, but may lead the court in a reasonable exercise of discretion to refuse to exercise jurisdiction." *See also Madsen v. Madsen,* 111 N.H. 315, 282 A.2d 667, 668 (1971) (trial court may decline to exercise its continuing jurisdiction where parties have moved to another state); *In re Marriage of Clark,* 232 Ill.App.3d 342, 173 Ill.Dec. 532, 597 N.E.2d 240 (1992) ("Under the doctrine of *forum non conveniens* ... a court has discretion to *decline to continue* its jurisdiction whenever it appears that there is another forum that can better serve the convenience of the parties and the end of justice.") (emphasis in original; citations and internal quotation marks omitted).

16. Early in the hearing held on that date, the judge made the following comments, which essentially telegraphed her subsequent ruling on the inconvenient forum issue:

THE COURT: Well, depending on how long it takes the court to get Mr. Sampson involved, if Ms. Johnson and the child relocate to Oregon and continue to live there, that would—at some period of time that's going to become the jurisdiction with the most contact with the family, with the witnesses for the child and the care of the child in the custodial parent's custody.

So at this point I don't know if there's going to be a trial date in this jurisdiction for this family. Because at some point in the future it wouldn't be. I don't know what point that becomes though.

Later in the hearing, the father's attorney appeared to agree:

THE COURT: And I don't really see what other hearing dates we can set at this point.

COUNSEL FOR THE FATHER: I don't either, Your Honor. I have a feeling within the next six months or so there's going to be a hearing in Portland and this matter will then moot itself out.

THE COURT: Right. Thank you very much.

Counsel's remark could almost be viewed as a near-concession, in advance, of the *forum non conveniens* motion which would predictably be filed after the mother had established a stable residence for Myriam and herself in Oregon.

17. The father argues that the case should not be transferred to Oregon because in the District, there is a presumption in favor of joint custody, D.C.Code § 16–914 (2001), whereas in Oregon joint custody will be granted only if both parents agree. OR. REV. STAT. § 107.169(3) (2001). We disagree. If Oregon has indeed become Myriam's "home state" and the most appropriate forum, then the applicable substantive law must be determined by an Oregon court in conformity with Oregon choice-of-law principles. *See Medlantic Long Term Care Corp. v. Smith,* 791 A.2d 25, 33 (D.C.2002); *cf. Mims v. Mims,* 635 A.2d 320, 324–25(D.C.1993) (applying the Maryland child support guideline where the children resided in Maryland, notwithstanding the more generous provisions of the District of Columbia guideline, and in spite of the fact that the litigation was instituted in the District).

When the judge relinquished jurisdiction over the case under the inconvenient forum doctrine, however, the visitation issue, at least from the father's perspective, remained unresolved. There was still no arrangement for visitation, and that situation was compounded by the lack of any effective communication between the parties. Moreover, the judge dismissed the suit without arranging for the case to come before an Oregon court, as contemplated by former § 16–4507(h), and she did not condition the dismissal on a requirement that the mother institute a proceeding in Oregon. *See* § 16–4507(e). The father was now not only without visitation rights, but also without a forum in which the issue was pending.

B. *The right to visitation.*

As this court explained forty years ago, "[t]he denial to a parent of his right of visitation with his children, who are in custody of the other parent, is a drastic action, and even more drastic is the denial of the right to communicate with them. Such action is justified only in extreme cases." *Paine v. Paine,* 201 A.2d 20, 22 (D.C.1964). In *Paine, id.* at 22, the court quoted from the earlier decision of the Municipal Court of Appeals in *Surrey v. Surrey,* 144 A.2d 421, 423 (D.C.1958):

> When custody of children has been awarded to one parent, the parent deprived of their custody has the right of visitation with the children and ought not to be denied that right unless by his conduct he has forfeited his right, or unless the exercise of the right would injuriously affect the welfare of the children. The right of visitation is an important, natural and legal right, al-

though it is not an absolute right, but is one which must yield to the good of the child. 2 Nelson, Divorce and Annulment § 15.26 (2d ed.1945). The right of access to one's child "should not be denied unless the chancellor is convinced that such visitations are detrimental to the best interests of the infant." *Townsend v. Townsend,* [205 Md. 591, 109 A.2d 765, 768 (1954)].

More recently, in *In re Ko. W.,* 774 A.2d 296, 304 (D.C.2001), we elaborated on these principles in language which bear significantly on the scenario now before us:

> [A] father's interest in retaining custody of his children is both legally cognizable and substantial, *Stanley* [*v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)], and may not be overridden in the absence of persuasive evidence that the children's well-being requires that custody be placed elsewhere.

In the present case, the restriction on the father's association with the respondents is more extreme than a denial of custody. For more than five years, the father has been deprived of any opportunity for visitation with his sons.... As a practical matter, for more than half a decade, the father's situation has closely resembled that of an individual whose parental rights have been terminated. From the father's quite reasonable perspective, this has been a drastic curtailment of his rights as a parent, which could properly be imposed only upon a persuasive showing that visitation by him would imperil the well-being of his

---

The father also seeks to invoke the principles underlying the District's Uniform Child Custody Jurisdiction legislation, D.C.Code §§ 16–4501 *et seq.* (1992 Repl.) (repealed). He argues that the mother "unilaterally" re-

moved Myriam to Oregon and now seeks to profit from that "unilateral" removal. Because the mother sought and obtained court leave for this removal, the father's contention cannot prevail.

sons.[18]

■■■ Counsel for the mother suggests, without quite asserting, that the father has forfeited his right to visitation with Myriam by failing to comply with his child support obligations. We do not agree. "Public policy requires the treatment of support of children and visitation rights as distinct problems." *Stancill v. Stancill,* 286 Md. 530, 408 A.2d 1030, 1034 (1979) (quoting *Mallinger v. Mallinger,* 197 Pa.Super. 34, 175 A.2d 890, 892 (1961)) (internal brackets and ellipsis omitted). A substantial majority of the courts have held that while refusal to pay child support is reprehensible, a father's visitation rights cannot be conditioned upon compliance with a support order. *See, e.g., Stancill,* 408 A.2d at 1034–35;[19] *Price v. Dawkins,* 242 Ga. 41, 247 S.E.2d 844, 845–46 (1978) (citations omitted); *Frazier v. Frazier,* 395 So.2d 590, 591 (Fla.Ct.App.2d Dist.1981); *Comm. ex rel. Lotz v. Lotz,* 188 Pa.Super. 241, 146 A.2d 362, 363 (1958) (per curiam), *aff'd,* 396 Pa. 287, 152 A.2d 663 (1959) (per curiam);[20] *see* Edward L. Raymond, Jr., J.D., Annotation: *Withholding Visitation Rights for Failure to Make Alimony or Support Payments,* 65 A.L.R.4th 1155, 1162 (1988 & Supp.2003) (hereinafter *Withholding Visitation Rights*) ("It has generally been held that a court may not deny or withhold a parent's right to visitation merely for non-payment of support."). In *Engrassia v. Di Lullo,* 89 A.D.2d 957, 454 N.Y.S.2d 103, 104 (1982), the court synopsized the applicable law:

> Visitation may not be denied solely for reasons unrelated to the best interest and welfare of the child. The failure of the noncustodial parent to make payment, without more, is an insufficient basis upon which to deny visitation. . . .

> Denial of visitation rights of a noncustodial parent is proper when substantial evidence exists that visitation is detrimental to a child's welfare. . . .

> . . . The papers on this appeal disclose that the plaintiff is in fact pursuing other remedies to enforce the child support provisions included in the various court orders.

Although we understand plaintiff's frustration with defendant's persistent refusal to fulfill his financial obligations

---

**18.** In *In re Ko.W.,* the father had been accused, albeit with little if any evidence, of sexually abusing one of his sons. No such allegation has been made against the father in this case.

**19.** In *Stancill,* the court stated:
Many courts hold that, since the paramount concern when awarding or denying the visitation privilege is the welfare of the child, and since visitation with the noncustodial parent benefits the child in all but rare instances, the nonpayment of child support, absent other circumstances, is not sufficient cause to deny companionship with the child.
408 A.2d at 1034.

**20.** As the court concisely put it in *Lotz,* 146 A.2d at 363, "mere failure to support is not grounds for refusing visitation rights." The court went on to state:

> Visitation rights of a parent not in custody have long been a matter of concern to the law of this Commonwealth. They must be carefully guarded for when parents are separated and custody is placed in one of the parents, there exists a danger that the parent having custody of the child may use his or her advantageous position to alienate the other parent from the affections of the child. Were we to reverse the order of the court below, we would provide an easy method for any person who has obtained the custody of a child to nullify the visitation rights granted by the court. A court which has awarded custody of a child can require the person to whom such custody has been awarded to exert reasonable authority over such child to require it to obey the lawful orders of a court [and thus to make court-ordered support payments].
> *Id.* at 364.

to the children, denying defendant visitation will not remedy the situation and would not be in the best interests of the children.

(Citations omitted.)

The principle animating the foregoing authorities is not an unyielding one. In *Raible v. Raible*, 242 Md. 586, 219 A.2d 777, 781–83 (1966), for example, the father was a millionaire who had nevertheless developed an arrearage of $ 38,750 in child support. The father did not deny that he was able to make the court-ordered support payments, and he had twice been held in contempt of court for noncompliance with a support order. On this factual scenario, the court concluded that the welfare of the children would be promoted by conditioning further visitation on the father's satisfaction of the arrearage. *See also Withholding Visitation Rights*, 65 A.L.R.4th at 1171–75. Nevertheless, in the absence of a compelling showing that visitation will be harmful to the child, contact between the father and his daughter should not be prevented or curtailed solely because the father has not paid his court-ordered child support.[21]

The mother also implies that denial of visitation rights to the father may be sustainable, in part, because the father failed to avail himself of a majority of his opportunities for visitation while the mother and Myriam were living in North Carolina. Counsel for the father attributes these failures to circumstances created by the father's religious convictions.[22] In any event, irregularity in visitation would not constitute grounds for extinguishing the right. "The courts have granted visitation rights to parents even in those circumstances where the parent has ignored the children for a long period of time," *Lotz*, 146 A.2d at 364, provided, of course, that there has been no showing that visitation would harm the child.

If the trial judge intended to deny the father visitation rights for an indefinite period—and her intention in this regard is unclear—she did not make findings which would warrant such a denial in light of the authorities we have cited above.[23] Accordingly, the orders on appeal must be vacated, and the case must be remanded for further proceedings.

### C. The remand.

In light of the foregoing discussion, we remand the case to the trial court for further proceedings consistent with this opinion. On remand, the trial court should make reasonably detailed findings with respect to the question whether the District of Columbia has become an inconvenient

---

21. While the case was pending in the Superior Court, the mother was, of course, free to enforce the father's child support obligation by requesting the court to exercise its contempt power to compel payment. Moreover, with respect to the very substantial arrearages that have accumulated, execution may issue on the father's assets, for "[e]ach installment which matures under a decree which has not been modified becomes a judgment debt similar to any other judgment for money." *Kephart v. Kephart*, 89 U.S.App. D.C. 373, 381, 193 F.2d 677, 684 (1951) (en banc), *cert. denied*, 342 U.S. 944, 72 S.Ct. 557, 96 L.Ed. 702 (1952).

22. According to the father's brief, "Appellee states that Mr. Sampson failed to exercise his visitation rights on at least ten of sixteen scheduled visits, but she fails to mention that she agreed with Mr. Sampson while he was fasting during the Holy Month of Ramadan, that it would be imprudent to be driving 700 miles per weekend .... Additionally, Mr. Sampson was invited to the Arabian Gulf to observe Ramadan."

23. Indeed, the judge made no findings at all with respect to the issue of child support.

forum (and, if appropriate,[24] with respect to the father's motion to modify custody and visitation based on changed circumstances). The court's findings should reflect the situation as it exists following the remand. *See In re Te.L.,* 844 A.2d 333, 344 (D.C.2004).[25] In the event that the trial judge is disposed, on remand, to grant the motion to dismiss on inconvenient forum grounds, she must comply with § 16–4507(h), and she should seriously consider following the procedure authorized by § 16–4507(e)—a procedure which is now mandatory under the more recent "inconvenient forum" provisions of D.C.Code § 16–4602.07(c) (2001). If the judge elects, upon remand, to rule on the father's motion to modify custody and visitation, and thus to decide the issue relating to the father's visitation rights (rather than passing on this responsibility to an Oregon court), then she must make written findings of fact and conclusions of law in conformity with Super. Ct. Dom. Rel. R. 52(a).

## III.

### CONCLUSION

For the foregoing reasons, Appeal No. 00–FM–183 is dismissed. The orders that are the subject of Appeals Nos. 00–FM–689 and 00–FM–1697, *i.e.,* Order No. 2 and Order No. 3, are vacated, and the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

24. If the trial judge concludes on remand that the District is an inconvenient forum and that Oregon is a superior one, then it may be appropriate for an Oregon court to decide the issues of custody and visitation. In that eventuality, however, the Superior Court should consider entering an interim custody or visitation order pending the assumption of jurisdiction by an Oregon court, and deferring dismissal of the action until a proceeding has been initiated in Oregon.

25. Shortly before this opinion was issued, the father filed a motion to supplement the record on the basis of events alleged to have occurred since the appeal was filed. These developments may be brought to the attention of the trial court on remand. Accordingly, the father's motion is denied without prejudice to an appropriate submission to the trial court. The mother's motion for additional time to respond to the father's motion to supplement the record is denied as moot.