*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 23-FM-0359 & 23-FM-0379

RUSSELL BUILTA, JR., APPELLANT/CROSS-APPELLEE,

V.

SANDRA GUZMÁN, APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(2015-DRB-002856)

(Hon. Deborah J. Israel, Trial Judge)

(Argued March 5, 2024                    Decided October 3, 2024)

*Ronald A. Colbert* for appellant/cross-appellee.

*Rebekah Sullivan* for appellee/cross-appellant.

Before BLACKBURNE-RIGSBY, *Chief Judge*, DEAHL, *Associate Judge*, and GLICKMAN, *Senior Judge.*

GLICKMAN, *Senior Judge*: Russell Builta, Jr. (appellant/cross-appellee) and Sandra Guzmán (appellee/cross-appellant) appeal the Superior Court's rulings on their motions to amend the child support and child custody arrangements in the order granting their divorce. The parties raise two principal issues: first, they challenge the Superior Court's modification of Mr. Builta's child support obligation, which was in part based on increases in his and Ms. Guzmán's incomes and calculated via

an extrapolation of the child support guideline. Second, Mr. Builta and Ms. Guzmán challenge changes the trial court made or declined to make concerning their custody arrangements over their child, E.A. For the following reasons, we affirm in part and reverse in part, and remand to the Superior Court for reconsideration of its child support order and further proceedings in accordance with this opinion.

## I. Factual Background

Mr. Builta and Ms. Guzmán have one child, E.A., who was born in 2014. In 2015, Ms. Guzmán sought legal separation from Mr. Builta in the Superior Court, requesting among other things, child support and sole legal and primary physical custody of E.A. Mr. Builta responded with a counterclaim for absolute divorce and sought joint legal and physical custody of E.A. In 2016, while these matters were still pending, the court issued a support order requiring Mr. Builta to pay Ms. Guzmán $1,736 per month in child support.

In June 2018, the court issued its Final Order awarding Mr. Builta an absolute divorce from Ms. Guzmán. The Final Order obligated him to continue paying $1,736 per month in child support and awarded both parties joint legal custody of E.A. with tie-breaking authority vested in Mr. Builta. Between themselves, Mr. Builta and Ms. Guzmán also agreed that they would share joint physical custody of E.A. "on an equal (50/50) basis" pursuant to a specified schedule. In accordance

with the parties' wishes, the court incorporated, but did not merge, this Consent Agreement Regarding Physical Custody in its Final Order. Finally, the court retained jurisdiction to enforce the Final Order's terms and resolve any disputes arising under the order.[1]

Beginning in June 2019, one year after the trial court entered the Final Order, Mr. Builta filed a series of motions to modify his child support obligation and the custody arrangements. First, he sought a change to the custodial exchange day under the parties' Consent Agreement and "additional safeguards" to his legal custody tie-breaking authority.[2] Then, in September 2019, he requested a court order prohibiting Ms. Guzmán from visiting E.A.'s school during his scheduled time. In April 2020, Mr. Builta sought a reduction in his child support obligation because Ms. Guzmán's salary had significantly increased. And finally, in December 2021, Mr. Builta filed an emergency motion to hold Ms. Guzmán in contempt for taking E.A. on a three-week Christmas vacation to Puerto Rico and not transitioning him during that period to Mr. Builta's care, allegedly in violation of the schedule mandated by the Consent Agreement.

---

[1] Ms. Guzmán noted an appeal from the Final Order, which this court dismissed in 2019.

[2] Mr. Builta originally requested sole physical custody but changed his request for relief at trial.

Ms. Guzmán also moved to modify the custody arrangements. She sought sole legal and physical custody of E.A. based on what she contended were substantial and material changes in circumstances—in particular, Mr. Builta's planned move (with his new wife and their two dependent children) to Severna Park, Maryland and his alleged pattern of abusing his tie-breaking authority.

In September 2022, after three days of hearings, the Superior Court issued a Second Trial Order to resolve all pending motions. In March 2023, after each party moved the court to amend that order, the court granted Mr. Builta's motion in part and denied Ms. Guzmán's motion. The amended Second Trial Order reduced Mr. Builta's child support obligation from $1,736 to $1,644 per month. It also maintained the parties' joint legal and physical custody of E.A., as the court found that neither party had proven a substantial and material change in circumstances justifying any alteration to the custody arrangements. Despite this, to address some of the issues that had caused difficulties between Mr. Builta and Ms. Guzmán, the court made certain changes to the 2018 Final Order that, in its view, did not amount to significant modifications. These included changing the day specified in the Consent Agreement for the parties to transfer physical custody of E.A. from Wednesday to Monday, requiring the parties to notify each other in advance of long-distance travel with E.A., and limiting the parties' presence at E.A.'s school during non-custodial times. Finally, the court found that Ms. Guzmán "did act in

contempt of the Court's First Trial Order" (i.e., the Consent Agreement incorporated in the Final Order) when she did not return E.A. to Mr. Builta for three weeks, but it declined to sanction her for that violation.

Before us now are the parties' appeals of these rulings.

## II. The Modification of Mr. Builta's Child Support Obligation

### A. The Statutory Guideline

In the District of Columbia, the Child Support Guideline ("Guideline"), D.C. Code § 16-916.01, governs the computation and modification of court-ordered child support.[3] The Guideline "set[s] forth an equitable approach to child support in which both parents share responsibility for the support of the child."[4] A court must presumptively rely on the Guideline for calculating child support unless doing so would be "unjust or inappropriate."[5]

Section 16-916.01(q)(1) establishes the procedure a court must presumptively follow to calculate child support under the circumstances present here—that is, where the child spends 35% or more of the year with each parent, thereby raising a

---

[3] D.C. Code §16-916.01(a).

[4] *Id.* § 16-916.01(c)(1).

[5] *Id.* § 16-916.01(p).

presumption that the parents share physical custody and where neither parent rebuts that presumption.[6] Under this procedure, the court makes a preliminary determination of the parents' "basic child support obligation," relying on the Schedule of Basic Child Support Obligations in the Guideline's appendix (Appendix I).[7] It uses this figure as a starting point upon which to calculate the parents' final child support obligations. The amount of this basic child support obligation is a function of the number of children entitled to the parents' shared support and the parents' combined adjusted gross income ("AGI"),[8] up to a combined AGI of

---

[6] *Id.* § 16-916.01(q)(1). "[E]ither parent may rebut this presumption by proving that the method of calculating the child support obligation based on shared physical custody would be unjust or inappropriate because of the parents' particular arrangements for the custody of the child." § 16-916.01(q)(3). If the presumption of shared physical custody is inapplicable or is rebutted, the procedure for calculating the child support obligation based on one parent's sole physical custody is set forth in Section 16-916.01(f). *See* § 16-916.01(q)(2).

[7] *See id.* §16-916.01(w).

[8] The court determines each parent's AGI by making the applicable additions to and deductions from gross income that are listed in Section 16-916.01(d)(1). Such adjustments take into account various circumstances that may reduce or increase the amount of the parent's income deemed available for child support, such as other child support obligations, the receipt or obligation to pay alimony, or the parent's voluntary unemployment or underemployment in a deliberate effort to avoid or minimize the obligation to pay child support. D.C. Code § 16-916.01(d)(1).

$240,000.[9] The Schedule provides that where the parents have a combined AGI of $240,000 and support one child, their basic child support obligation is $33,051.[10]

Where, as in the present case, the parents' combined AGI exceeds $240,000, another provision of the Guideline comes into play. Subsection (h) states as follows:

> The guideline shall not apply presumptively in cases where the parents' combined adjusted gross income exceeds $240,000 per year. In these cases, the child support obligation shall not be less than the amount that the parent with a legal duty to pay support would have been ordered to pay if the guideline had been applied to combined adjusted gross income of $240,000. The judicial officer may exercise discretion to order more child support, after determining the reasonable needs of the child based on actual family experience. The judicial officer shall issue written factual findings stating the reasons for an award of additional child support.[11]

So, for example, if parents with one child have a combined AGI greater than $240,000, their basic child support obligation will be no less than $33,051, and the court may set it at a higher amount.

The Guideline does not further constrain a court's exercise of discretion to order more child support when the combined AGI is greater than $240,000. In

---

[9] *Id.* § 16-916.01 app. I

[10] *Id.*

[11] *Id.* § 16-916.01(h).

general, the trial court "'has a considerable measure of discretion'" in determining the level of child support, and its "'determination will not be disturbed on appeal unless the court clearly abused its discretion.'"[12] With regard to that discretionary determination, this court has emphasized that "[o]ne of the basic principles of child support in the District of Columbia, embodied in both our statutory guidelines and our caselaw, is that [a] child is entitled to a level of support commensurate with the income and lifestyle of [their] parents."[13] Accordingly, a trial court is not required to base its child support determination "on the child's documented expenses where [parental] income exceeds the highest amount to which the Guidelines presumptively apply."[14] Although subsection (h) refers to "the reasonable needs of the child," our cases recognize that "the child's needs should not be interpreted so narrowly as to deprive the child of the quality of life" that the parents' elevated

---

[12] *Ford v. Castillo*, 98 A.3d 962, 965 (D.C. 2014) (quoting *Araya v. Keleta*, 65 A.3d 40, 48 (D.C. 2013)). When we review an award of child support (as with any other judgment by the trial court) for abuse of discretion, "we 'must determine whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion.'" *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019) (quoting *Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979)). Our review extends to assessing whether the trial court properly understood and applied the governing statute or other applicable law.

[13] *Galbis v. Nadal*, 626 A.2d 26, 31 (D.C. 1993); *see also Upson v. Wallace*, 3 A.3d 1148, 1158 (D.C. 2010) ("[T]he court can award a level of support commensurate with the income and lifestyle of the noncustodial parent.").

[14] *Upson*, 3 A.3d at 1158.

income permits the family to enjoy.[15]  It is appropriate for the court to consider "'the standard of living which the child would have enjoyed had the marriage not been dissolved'" in determining the child's needs.[16]

## B. The *Holland* Extrapolation Method

A discretionary method involving principled extrapolation has gained acceptance in Superior Court for use in determining the appropriate amount of the basic child support obligation when the parents' combined AGI exceeds $240,000. It is commonly referred to as the *Holland* method (because it was originally described in the opinion of Judge Neal Kravitz in *Holland v. Holland*[17]).  The method consists of extrapolating the Schedule of Basic Child Support Obligations to combined AGIs above $240,000 based on the sustained marginal percentage rate of increase in the obligation up to that ceiling.[18]  As explained in *Holland*, the Schedule provides that the basic child support obligation increases with combined AGI. However, the marginal percentage rate of increase of the combined AGI the Schedule allots to the support obligation decreases and gradually stabilizes as the

---

[15] *Galbis*, 626 A.2d at 31.

[16] *Id.* (quoting *Benvenuto v. Benvenuto*, 389 A.2d 795, 799 (D.C. 1978)).

[17] No. 2010 DRB 3062 at 4-5 (D.C. Super. Ct. July 19, 2012).

[18] *Id.*

combined AGI reaches $240,000. "Once the parents hit $200,000 in combined income," Judge Kravitz found, "the percentage of marginal income presumptively allotted to child support levels off at 13.29% for two children (10.78% for one child) and remains essentially unchanged up through $240,000."[19] Judge Kravitz found the continued use of that marginal rate to calculate the basic child support obligation for higher combined AGIs to be "most consistent with the trajectory" found in the Schedule and therefore "most loyal to the design of the Guideline."[20] Other Superior Court judges have agreed.[21]

To illustrate how the extrapolation method works, in *Holland*, the parents had two children and their combined AGI was $524,125.[22] Judge Kravitz accordingly computed the extrapolated basic total support obligation for the two children to be $81,183, the sum of $43,423 (the amount allotted in the Schedule for two children from the first $240,000 in combined income) plus 13.29% of the parents' remaining $284,125 in combined income.[23] For only one child, the calculated obligation would

---

[19] *Id.* at 5.

[20] *Id.* at 4-5.

[21] *See, e.g.*, *Teas v. Boorstin*, No. 2009 DRB 3322 (D.C. Super. Ct. Dec. 6, 2016); *Davis v. Kern*, No. 2006 DRB 2159 (D.C. Super. Ct. Mar. 30, 2015); *Kennedy v. Orszag*, No. 2006 DRB 2583 (D.C. Super. Ct. July 10, 2014).

[22] *Holland*, No. 2010 DRB 3062, at 5-6.

[23] *Id.*

have been $63,680, the sum of $33,051 (the amount allotted in the Schedule for one child from the first $240,000 in combined income) plus 10.78% of the parties' remaining $284,125 in combined income.[24]

We agree that the *Holland* method is frequently useful and appropriate in determining parents' basic child support obligation where their combined AGI exceeds $240,000. As Superior Court Judge Anthony Epstein observed when employing the *Holland* approach in a subsequent case, "[t]he extrapolated amount . . . provides a relatively objective reference point to assess what needs are reasonable for the children of affluent parents and reduces the need for arguably subjective judgments in drawing the line between generously providing for a child and spoiling the child."[25] It should be understood, of course, that use of the method is discretionary and its utility in a particular case may be outweighed or qualified by other considerations of the child's reasonable needs and the overall family situation.[26] "Extrapolation from the schedule may act as a 'guide,' but the judge

---

[24] *Id.* at 6.

[25] *Teas*, No. 2009 DRB 3322, at 31.

[26] *See Galbis*, 626 A.2d at 32 n.11.

may also exercise his or her own independent discretion in balancing the best interests and needs of the child with the parent's ability to meet those needs."[27]

Thus, we agree with Judge Epstein that a court must "determine[] on a case-by-case basis whether the straight-line extrapolation approach used in *Holland* is appropriate."[28] It will not always be. For example, as Judge Epstein observed,

> The higher the parents' combined income, the less informative this straight-[line] extrapolation may be. To use an extreme example, if [a] noncustodial parent's annual income is $20 million, extrapolating the guideline on a straight-line basis using a 10.78% marginal rate would result in an annual support award of more than $2.1 million, and to justify such an award, the Court would expect the custodial parent to provide probative evidence that a single child's "reasonable needs in light of actual family experience" (*see* D.C. Code § 16-916.01(h)) approach $200,000 per month. It is therefore reasonable to infer that the percentage of a wealthy parent's income that should support a child gradually declines as the parent's income rises to levels substantially greater than $240,000, although expert testimony may be needed to establish the specific rate of decline at different income levels.[29]

---

[27] *Teas*, No. 2009 DRB 3322, at 32 (quoting *Voishan v. Palma*, 609 A.2d 319, 324-25 (Md. 1992)) (internal quotation marks omitted), the first case in which Maryland's highest court addressed that state's child support guidelines based (like those of the District of Columbia) on a model considering the incomes of both parents).

[28] *Id.* at 33.

[29] *Id.* at 34.

**C. The Parties' Claims of Error in the Trial Court's Modification of Mr. Builta's Child Support Obligation**

The present case is on appeal from the trial court's modification of the child support order that the court rendered in conjunction with the parties' divorce in 2018. The Child Support Guideline provides in subsection (r) that a support order "shall be subject to modification by application of the guideline subject to [specified] conditions or limitations."[30] Pertinent here, under paragraph (r)(4)(A), a court must presume "that there has been a substantial and material change of circumstances that warrants a modification of a support order if application of the guideline to the current circumstances of the parents results in an amount of child support that varies from the amount of the existing support order by 15% or more."[31] Alternatively, paragraph (r)(4)(C) preserves "the ability of a parent to seek a modification of a support order upon a showing of a material and substantial change in the needs of the child or the ability of the parent with a legal duty to pay support to pay, regardless

---

[30] D.C. Code § 16-916.01(r); *see also* § 16-916.01(t) ("Upon the occurrence of a substantial and material change in circumstances sufficient to warrant the modification of a child support obligation pursuant to the guideline, the judicial officer may modify any provision of an agreement or settlement relating to child support, without regard to whether the agreement or settlement is entered as a consent order or is incorporated or merged in a court order.").

[31] *Id.* § 16-916.01(r)(4)(A); *see also* § 16-916.01(r)(6) ("The basic child support obligation . . . shall be used to compute the amount of child support the guideline would yield for modification and to apply the test for the presumption.").

of whether this change results in a support order that differs by 15% or more from the current order."[32]

When the Superior Court granted Mr. Builta and Ms. Guzmán a divorce in 2018, it found that Mr. Builta's annual gross income was approximately $235,000, and imputed to Ms. Guzmán an annual income of $32,614. The court thus concluded that their combined AGI exceeded $240,000. Although the court then did not apply the *Holland* method, it exercised its discretion in light of E.A.'s perceived needs to order Mr. Builta to pay $1,736 per month in child support, slightly more than the $1,570 it would have ordered had it applied the Guideline to a combined AGI of $240,000.

In the order now before us, the court recomputed Mr. Builta and Ms. Guzmán's child support obligations after finding that their annual gross incomes had risen to $290,515 and $103,690 respectively and that Mr. Builta (who had remarried) had acquired two other child dependents. For the latter reason, the court found that Mr. Builta was entitled to a deduction in his gross income for purposes of computing his child support obligation (which we explain below). In exercising its discretion to render an award greater than if the parties' combined AGI had been only

---

[32] *Id.* § 16-916.01(r)(4)(C).

$240,000, the court applied the *Holland* method. Factoring in Ms. Guzmán's larger proportionate share of her and Mr. Builta's combined AGI, the court reduced Mr. Builta's monthly child support obligation from $1,736 to $1,644 per month. This figure still was almost twice what the court would have ordered Mr. Builta to pay in child support had the parties' combined AGI been $240,000.

Both parties challenge this award on appeal. Mr. Builta seeks a greater reduction in his child support obligation while Ms. Guzmán contends the standard for modifying the existing order was not met and that, in any event, the court erred in calculating Mr. Builta's income. Neither party disputes the validity of the *Holland* method for extrapolating the total basic child support obligation when it is appropriate for the court to exercise its discretion to render an above-guidelines award. For different reasons, however, they object to the trial court's decision to exercise such discretion in modifying the 2018 award. We are not persuaded by either of their objections on that score.

The parties also challenge the trial court's particular computations, and we find merit in their claims. We agree with Ms. Guzmán that the court erred in determining the amount of Mr. Builta's gross income (and hence the amount of the parties' combined AGI). And we agree with Mr. Builta that, after the court determined the combined AGI and chose to employ the *Holland* method, the court

erred by failing to compute his child support obligation correctly in accordance with the step-by-step procedure set out in Section 16-916.01(q)(1) for shared custody situations.

To begin, Mr. Builta argues that the actual needs and expenses of his and Ms. Guzmán's child were not shown to justify any discretionary award at all based on the parents' combined AGI being above $240,000.  However, as we have said, such a showing was not required to justify such an award.  As parental income materially increases, it is reasonable for child support to keep pace with it so that the children may partake in the enhanced quality of life that their parents' increased affluence permits them to enjoy.[33]  In the absence of countervailing evidence, a court does not abuse its discretion by finding this to constitute a "reasonable need" of the child "based on actual family experience" within the meaning of Section 16-916.01(h).[34]

Ms. Guzmán argues that modification of the 2018 child support order was not supported by a material and substantial change in the relevant circumstances, as required by paragraphs 16-916.01(r)(4)(A) and (C) quoted above.[35]  We are not persuaded.  For one thing, on its face, Mr. Builta's remarriage and his assumption of

---

[33] *Upson*, 3 A.3d at 1158.

[34] D.C. Code § 16-916.01(h).

[35] *Id.* §§ 16-916.01(r)(4)(A), (C).

parental responsibility for two additional child dependents likely constituted a "material and substantial change" in his ability to pay support within the meaning of paragraph (C), even given that his gross income had increased by some 23% (i.e. from about $235,000 to $290,000).[36] The Guideline assumes as much, insofar as it provides that "[e]ach parent shall receive a deduction from gross income for each child living in the parent's home for whom the parent owes a legal duty to pay support, if the child is not subject to the support order.[37] The agreed-upon amount of that deduction in Mr. Builta's case was $32,567. The trial court found that this deduction in itself reduced Mr. Builta's child support obligation by over $200 per month.[38]

---

[36] *Id.* § 16-916.01(r)(4)(C).

[37] *Id.* § 16-916.01(d)(5).

[38] Mr. Builta argues that, assuming the court correctly applied the *Holland* method to this case, it should have also applied the extrapolation to the calculation of his dependent child deduction as well, which would have resulted in a larger deduction. This argument comes too late and, indeed, runs counter to his position at trial. In his Motion to Amend, Mr. Builta only argued for a dependent credit of $32,567, which he received and was based off of a maximum income of $240,000. He has therefore forfeited this argument on appeal. *See Pajic v. Foote Properties, LLC*, 72 A.3d 140, 145 (D.C. 2013) (explaining that, in civil cases, this court's review in civil cases is generally limited to issues that were "properly preserved," absent "exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record" (internal quotation marks omitted)).

In any event, the 2018 support order was subject to modification in accordance with paragraph (A) because, as we proceed to show, properly applying the Guideline to the changed circumstances of both Mr. Builta and Ms. Guzmán results in an amount of child support that varies from the amount of the 2018 support order by 15% or more. Ms. Guzmán asserts that, by its terms, this provision applies only to the "application of the guideline," and that therefore it is inapplicable where the parents' combined AGI exceeds $240,000. We disagree. That the Guideline accords the court discretion when the AGI exceeds $240,000 does not mean that the court is not applying the Guideline in exercising that discretion. On the contrary, in exercising its discretion in such cases, the court remains bound to comply with the other applicable provisions of the Guideline.

We turn, therefore, to the computation of the support order in this case. We partially agree with Ms. Guzmán that the trial court erred in excluding from its determination of Mr. Builta's gross income (1) his veteran's disability benefits and (2) what the court deemed his "intermittent and sporadic additional sources of income," including bonuses and capital gains. The court explained that it chose to disregard sources of Mr. Builta's additional income where "there was no evidence presented to establish the frequency or duration of these income sources." This explanation is not entirely adequate.

For purposes of implementing the Guideline, Section 16-916.01(d)(1) defines the term "gross income" to mean "income from any source."[39] In addition to salary or wages, the Guideline lists a number of other sources that are or may be included in the definition such as veteran's benefits, bonuses, and capital gains.[40] Veteran's benefits are not intermittent or sporadic, and they clearly must be included in a parent's gross income; the trial court erred in excluding them. Bonuses may well not be assured or constitute a regular component of income, but the uncertainty or irregularity of their continued payment is not enough to overcome the statutory presumption that they be included in gross income. As this court has noted, the definition of "gross income" specifically includes several categories that "typically are not regular sources of income," bonuses among them.[41] On the other hand, the Guideline states that "[c]apital gains from . . . real or personal property transaction[s]" are included in gross income only "if the capital gains represent a regular source of income."[42] Hence, we do not find that the trial court clearly erred

---

[39] D.C. Code § 16-916.01(d)(1).

[40] *See id.* §§ 16-916.01(d)(1)(E), (I), (P).

[41] *Crater*, 201 A.3d at 584 ("[F]or example, severance pay, bonuses, lottery or gambling winnings that are received in a lump sum, and prizes or awards.") (citing §§ 16-916.01(d)(1)(C), (E), (U), and (V)).

[42] D.C. Code § 16-916.01(d)(1)(P); *see also Lasche v. Levin*, 977 A.2d 361, 370 (D.C. 2009) (stating that "in the case of investment capital, the payouts, if to be included in gross income, must be made on a regular basis so as to be the equivalent

in excluding Mr. Builta's capital gains on grounds that they were intermittent and sporadic. Accordingly, on remand, the trial court must determine Mr. Builta's gross income by including his veteran's benefits and bonuses as shown by the evidence. The court may also need to include other non-regular sources of income. It must then determine anew the parties' combined AGI to calculate their child support obligations.

We also agree with Mr. Builta's critique of the procedure the trial court followed to compute his child support obligation after having determined his gross income and the parties' combined AGI. The trial court erred by failing to follow the step-by-step procedure set forth in subsection (q) of the Guideline, that applies when the parents share physical custody of the child.[43] As a result, the court did not properly compute or allocate the support burden between Mr. Builta and Ms. Guzmán, as required by Section 16-916.01(q)(1).

The trial court stated that it computed Mr. Builta's child support obligation as follows:

---

of income payouts"). Other sources that must come with regularity to be included in the statutory definition of "gross income" include income resulting from a contract, in-kind compensation, and income from an interest in an estate. D.C. Code §§ 16-916.01(d)(1)(Q), (R), (T).

[43] *Id.* § 16-916.01(q)(1).

Using the correct figure of $361,637.75 as the parties' combined adjusted gross income, the Court determines that the above-the guideline calculation would be as follows: $361,637.25 - $240,000 = $121,637.25. $121,637.25 x 10.78% = $13,112.50 (the annual additional support above the guideline [pursuant to the *Holland* extrapolation]). $13,112.50 x 71% (the percentage allocation to [Mr. Builta] based on their respective incomes) = $9,309.88 ([Mr. Builta's] annual above-the-guideline child support obligation). $9,309.88/12 = $775.82 ([Mr. Builta's] monthly above-the-guideline . . . child support obligation). Combined with [Mr. Builta's] monthly guideline child support amount [attributable to the first $240,000 of his AGI] . . . , which is $868.00, the Court determines that the total monthly child support obligation for [Mr. Builta] is $1,644.00.

The foregoing procedure was incorrect. Using, for the sake of comparison, the parties' gross incomes and their combined AGI of $361,638 that the trial court used (though those figures may need to be updated on remand), here is how the child support order should have been computed, step by step.

The first step in the procedure involves determining the basic child support obligation and multiplying it by 1.5 to arrive at the adjusted basic child support obligation.[44] Employing the *Holland* method to the combined AGI, the basic child support obligation is $46,164; this figure is the sum of $33,051 (the basic child support obligation shown in the Schedule for one child and a combined AGI of

---

[44] *Id.* § 16-916.01(q)(1)(A).

$240,000)[45], plus $13,113, which is the *Holland* extrapolation applied to the portion of the combined AGI over $240,000 (i.e., 10.78% x $121,638). Multiplying this figure by 1.5 gives an adjusted basic child support obligation of $69,246 (we round all figures to the nearest dollar).

The second step is to determine "each parent's proportionate share of the adjusted basic child support obligation based on each parent's share of combined adjusted gross income."[46] Based on their respective individual AGIs of $257,948 and $103,690, Mr. Builta's proportionate share of the combined AGI was 71.3% and Ms. Guzmán's was 28.7%. The trial court rounded these figures to 71% and 29% and for present purposes we shall do the same. Accordingly, Mr. Builta's share of the adjusted basic child support obligation was 71% of $69,246, or $49,165 and Ms. Guzmán's share was 29% of $69,246, or $20,081. Note that the trial court erred by failing to multiply the entire adjusted basic child support obligation by 71% and 29% to determine each parent's share of it and from here on, did not perform the necessary steps for computing and allocating the child support obligation.[47]

---

[45] *Id.* § 16-916.01 app. I

[46] *Id.* § 16-916.01(q)(1)(B).

[47] The trial court declined Mr. Builta's request that it perform the steps as set forth in subsection (q)(1) because it believed that the *Holland* extrapolation procedure obviated the need for those steps. That was a mistake. The *Holland*

The third step is to determine "the amount of child support [retained] by each parent by multiplying each parent's share of the adjusted basic child support obligation by the percentage of time the child spends with the . . . parent."[48] As Mr. Builta and Ms. Guzmán share physical custody of their child on an equal basis, this percentage for each of them was 50%. Therefore, the parents' retained shares of child support were $24,582 (Mr. Builta) and $10,040 (Ms. Guzmán).

In the fourth step, the court must subtract the amount of child support retained "by each parent from [that] parent's share of the adjusted basic child support obligation to determine the amount of each parent's child support obligation."[49] Mr. Builta's child support obligation was therefore $24,582 and Ms. Guzmán's was $10,040.

---

procedure affects only the determination of the adjusted basic child support obligation (the first step of the statutory procedure) when the combined AGI of both parents exceeds $240,000; the extrapolation of that obligation does not change how the parents' respective shares of the child support obligation are determined by the subsequent steps.

[48] *Id.* § 16-916.01(q)(1)(C).

[49] *Id.* § 16-916.01(q)(1)(D). As stated in subparagraph (F), the parents' respective shares of the adjusted basic child support obligation determined under subparagraph (D) are subject to adjustments for payments in connection with the child's medical expenses, reasonable child care expenses, and SSDI derivative benefits paid to the child, as set forth in subsections (i)-(l) of § 16-916.01. § 16-916.01(q)(1)(F). It does not appear that such adjustments were applicable in this case.

Lastly, the parent with the larger child support obligation determined in the previous step has the "legal duty to pay support" and must "pay the difference between the 2 amounts to the other parent."[50] Accordingly, given the inputs the trial court used, it should have found Mr. Builta's annual child support obligation to be $14,542, or $1,212 per month. This was $432 per month less than what the court determined, which reflects the fact that Ms. Guzmán's gross income had increased (to more than triple what the court imputed it to be in 2018) and she was therefore able to shoulder significantly more of the total child support burden than she had been obliged to shoulder in the past.[51]

On remand, the court should re-compute the child support obligation with correct and updated income data in accordance with the procedure specified in Subsection (q)(1).[52]

---

[50] *Id.* § 16-916.01(q)(1)(E).

[51] Thus, it would be a mistake to think that the child's needs will not be met if Mr. Builta's monthly child support obligation is reduced from $1,736 to $1,212. The reduction is more than made up for by the substantial increase in Ms. Guzmán's income and resulting share of responsibility for the child's support. To illustrate the point, we estimate that in 2018, the adjusted basic child support obligation was around $54,000 and Ms. Guzmán's share of it was only about 12%, whereas the adjusted basic child support obligation has grown to over $69,000, and her share of that obligation has risen to 29%.

[52] In reducing Mr. Builta's monthly child support obligation by $92 (from $1,736 to $1,644), the trial court denied his request to make the reduction retroactive

### III. The Rulings Regarding Child Custody

Ms. Guzmán, seeking sole legal and physical custody of E.A., contends that the trial court erred in concluding that she had not carried her burden of showing a substantial and material change in circumstances warranting such a modification of custody in E.A.'s best interests. We are not persuaded that the court erred in this regard. Ms. Guzman further argues that the court abused its discretion by making certain lesser modifications to the existing custody arrangements without such a changed-circumstances finding. We agree with Ms. Guzmán that the court erred in certain respects.

Child custody determinations in proceedings between parents are governed by D.C. Code § 16-914. Once it has been entered, a custody award may be modified or

---

(i.e., providing him with an overpayment credit, at least for the period when his motion to modify was pending). Mr. Builta argues that, in so ruling, the court abused its discretion under D.C. Code § 46-204(c), which provides that "[n]o modification of . . . child support . . . may be retroactive, except that a modification may be permitted for the period during which a petition for modification is pending." D.C. Code § 46-204(c). Given that we vacate the child support order and remand for further proceedings and a re-computation of child support, we do not address the issue of retroactivity at this time. In the event the trial court enters a new award reducing Mr. Builta's child support obligation, Mr. Builta may request a retroactive credit, and the court may consider afresh whether to grant it in light of all the relevant circumstances.

terminated on motion by one or both parents or on the court's own motion.[53]  Such

a motion, however, "is not to be used as a pretense to re-litigate the equities of the

prior decree."[54]  In general, an award of custody may be modified only "upon a

determination that there has been a substantial and material change in circumstances

and that the modification or termination is in the best interests of the child."[55]  Where

(as here) custody arrangements have been determined by the parties' voluntary

agreement,[56] which has been incorporated but not merged into the divorce decree,

the court cannot modify those arrangements unless it also finds that the substantial

and material change in circumstances "was not foreseen at the time the agreement

---

[53] *Id.* § 16-914(f)(1).

[54] *Galbis*, 626 A.2d at 28 (D.C. 1993) (quoting *Graham v. Graham*, 597 A.2d 355, 357 n.5 (D.C. 1991)).

[55] D.C. Code § 16-914(f)(1).  A court considers "all relevant factors" when determining the best interest of the child, which is always the "primary consideration."  §§ 16-914(a)(1)(A), (a)(3).

[56] *See id.* § 16-914(h) ("The Court shall enter an order for any custody arrangement that is agreed to by both parents unless clear and convincing evidence indicates that the arrangement is not in the best interest of the minor child.").

was entered."[57] The party seeking the modification has the burden of proof, which is by a preponderance of the evidence.[58]

This court will reverse a trial court's order regarding child custody only "upon a finding of manifest abuse of discretion."[59] As with a discretionary determination of child support, the trial court's exercise of discretion "must be grounded 'upon correct legal principles and must rest on a firm factual foundation.'"[60] We thus review the trial court's legal conclusions de novo and its factual findings for clear error.[61]

Ms. Guzmán contends that (1) Mr. Builta's plan to move away from the District of Columbia to Severna Park, Maryland and (2) his alleged pattern of abusing his tie-breaking authority in making decisions about E.A. without properly

---

[57] *Downing v. Perry*, 123 A.3d 474, 481 (D.C. 2015) (quoting *Foster-Gross v. Puente*, 656 A.2d 733, 737 (D.C. 1995)); *see also Swift v. Swift*, 566 A.2d 1045, 1047 (D.C. 1989) ("[I]n certain circumstances a trial court may modify agreements [that] are incorporated but not merged into a divorce decree, but the authority to do so is limited. . . . Such modifications require a showing that a substantial and material change in circumstances unforeseen at the time the agreement was signed has occurred." (citations omitted)).

[58] D.C. Code § 16-914(f)(2).

[59] *Jordan v. Jordan*, 14 A.3d 1136, 1146 (D.C. 2011); *Littman v. Cacho*, 143 A.3d 90, 93 (D.C. 2016).

[60] *Jordan*, 14 A.3d at 1146 (quoting *Wilkins v. Ferguson*, 928 A.2d 655, 666-67 (D.C. 2007)).

[61] *Id.*

consulting her constituted unforeseen substantial and material changes in circumstances. We address each of these issues in turn.

### A. Mr. Builta's Planned Move to Severna Park

When the trial court entered its initial order in 2018 granting the parties a divorce and providing for shared custody, it noted that "[b]oth parents intend to live in or near the District of Columbia." The court left the term, "near," open to interpretation and subject to the parties' judgment. Shortly before the 2021 evidentiary hearing on the modification motions, Mr. Builta informed Ms. Guzmán and the court that he intended to move his new household to Severna Park, a suburb of Baltimore roughly an hour's drive from the District of Columbia, where Ms. Guzmán continued to reside and where E.A. attended school.[62] At the hearing, Ms. Guzmán contended that Mr. Builta's relocation would constitute a substantial and material change of circumstances requiring modification of the existing child custody arrangements in the child's best interests. Emphasizing what she takes to

---

[62] By this time, in preparation for his relocation, Mr. Builta had moved temporarily to Pasadena, Maryland, which is close to Severna Park. Mr. Builta testified that the trip from his home in Maryland to E.A.'s school in the District took "45 minutes at most to an hour," and that this was about the same amount of time it took him to take E.A. to school when he resided in the District. Ms. Guzmán presented no credited testimony to the contrary. The trial court appears to have credited Mr. Builta's testimony, though it also agreed that the commute could take longer.

be the lengthy commute between Severna Park and the District and the demographic

and other differences between the two communities,[63] Ms. Guzmán argues that the

move

> substantially increases the burden on the child of
> commuting to and from school, the ability for him to do
> his homework and reading each night, the time he wakes
> up, the time he goes to bed, his ability to engage in
> extracurricular activities, the willingness of friends to visit
> him at his father's home, the willingness of his father to
> take him to any friends' homes or events in D.C., the
> burden on Ms. Guzmán of transporting the child for
> exchanges, and a difference in culture, enrichment
> opportunities, and diversity.

Ms. Guzmán argued that Mr. Builta's move to Severna Park warranted a change in

both legal and physical custody of E.A.—a change from the parent's shared custody

to her sole legal and physical custody.

The trial court concluded, however, that Ms. Guzmán failed to carry her

burden to prove that Mr. Builta's move to Severna Park would constitute a

substantial and material change in circumstances calling for any modification of the

---

[63] Ms. Guzmán points out that E.A. is "multi-racial" and asserts that unlike the District of Columbia, Severna Park is predominantly a "very White city."

custody arrangements.[64]    We see no reason to disturb the court's conclusion.  "A father's interest in retaining custody of his children is both legally cognizable and substantial, and may not be overridden in the absence of persuasive evidence that the children's well-being requires that custody be placed elsewhere."[65]  Ms. Guzmán failed to present such persuasive evidence.

Although Ms. Guzmán identified several possible adverse consequences from Mr. Builta's move, none of them had yet come to pass and some were entirely speculative.  The court considered Ms. Guzmán's concerns and found she "ha[d] not pointed to any evidence in the record as to why this [move] would specifically be an issue for" E.A.  This was a fair assessment in our view.  Ms. Guzmán did not make an adequate evidentiary showing that Mr. Builta's relocation would amount to more than a mere inconvenience, that it would impede compliance with their custody arrangements, or that it would be detrimental to E.A.[66]  The court was not confronted

---

[64] This issue, of whether the move to Severna Park was a substantial and material change of circumstances justifying a change in the custody arrangements, does not depend on whether the specific custody change that Ms. Guzmán sought would be justified by the change.

[65] *Sampson v. Johnson*, 846 A.2d 278, 286 (D.C. 2004) (brackets and citation omitted).

[66] Ms. Guzmán raises a related discovery claim, arguing that the trial court abused its discretion by denying her motion to reopen discovery when she learned that Mr. Builta was intending to relocate.  Ms. Guzmán claims she needed to undertake this further discovery because she knew "virtually nothing about Mr.

with a situation in which a distant relocation by one of the parents would thwart the

parents' ability to share custody as they had agreed or traumatically uproot the child

from his environment.[67]  A somewhat long commute to and from school or between

the parents may be inconvenient and less than ideal, but long commutes are not

---

Builta's contemplated home, neighborhood, demands of employment, commute, local school, or other facts material to his relocation." Mr. Builta opposed the motion, arguing among other things that it would delay an evidentiary hearing on matters that had been pending for two years, and that Ms. Guzmán had delayed seeking discovery relating to his move and had not shown that it would be relevant or that she would be prejudiced at trial.

In denying the motion, the court found that "it would be prejudicial to both parties to reopen discovery and further delay trial," and that this prejudice was "not outweighed by any concomitant need" of Ms. Guzmán to take the additional discovery. However, the court further found that the location of Mr. Builta's future residence would be relevant and important to the "determination of whether—and if so, how—to modify custody of the minor child." Accordingly, while the court denied Ms. Guzmán's motion, it ordered Mr. Builta to file a praecipe disclosing his current address, where he intended to stay during the remaining course of the litigation, and "the address where [he] intends to move in the foreseeable future."

Thus, Ms. Guzmán was aware prior to trial that Mr. Builta planned to move to Severna Park, she had the opportunity to investigate that community in advance of trial, and at trial her counsel could examine both Mr. Builta and his wife about the "facts material to his relocation." We conclude that she has not demonstrated that the court abused its discretion in denying her motion to reopen discovery or that the ruling prejudiced her at trial.

[67] *Cf. Sampson*, 846 A.2d at 284 (mother's relocation with the daughter from North Carolina to Oregon, "some three thousand miles away," effectively "terminat[ed] contact between father and daughter for years to come"); *Estopina v. O'Brian*, 68 A.3d 790, 793-95 (D.C. 2013) (holding that trial court did not abuse its discretion in granting appellant's ex-wife joint legal custody and primary physical custody of their four-year-old child and allowing the mother and child to move from the District of Columbia to Virginia Beach, Virginia).

uncommon and are often tradeoffs in exchange for other benefits in a family's living arrangements.[68]  These are largely matters left to the separated parents' discretion, so long as the parents continue to act in the child's best interest and comply with the terms of their custodial agreement and the court's orders.  The court did not ignore Ms. Guzmán's concern with the demographic and cultural differences between Severna Park and the District of Columbia, but it declined to find without evidence that those differences would harm E.A. or constitute a substantial and material change in his circumstances.  Moreover, the impact of Mr. Builta's move on E.A. and Ms. Guzmán was mitigated in this case precisely because custody is shared equally, meaning E.A. will continue to reside with her in the District of Columbia half the time, he could maintain his relationships and activities there, and the burden of the commute to Severna Park on Ms. Guzmán would be minimal (arising only when it was her once-a-week duty to return E.A. to Mr. Builta's physical custody).

Ms. Guzmán disagrees with how the trial court weighed the evidence pertaining to Mr. Builta's planned move to Severna Park, but she fails to persuade us that the court's findings were clearly erroneous, that the court ignored material evidence, or that the conclusions it drew were unreasonable.  That the court perhaps

---

[68] Indeed, in this case, the trial court credited the testimony that the duration of the child's travel between his father's residence and his school would remain about the same.

could have made findings and drawn conclusions more favorable to Ms. Guzmán's position is not enough for us to overturn its decision. "Where the evidence is such that either one of two different conclusions might reasonably have been drawn from it, the decision is for the trial court; and the appellate court may not reweigh the evidence or override the findings, except where it clearly appears they are manifestly wrong."[69] We therefore defer to the trial court's findings and its determination that Mr. Builta's move to Severna Park did not constitute a substantial and material change in circumstances warranting a modification of the parties' custody arrangements.

## B. Mr. Builta's Alleged Abuse of His Tie-Breaking Authority

The 2018 Final Order awarded joint legal custody over E.A. to Mr. Builta and Ms. Guzmán and granted tie-breaking authority to Mr. Builta. Specifically, the Final Order provided as follows:

> When faced with a decision regarding the minor child's safety and general welfare, the parties are required to timely communicate about the decision and any options, including which option(s) is in the minor child's best interest. The parties are then required to try to reach a shared decision. If, and only if, the parties are unable to reach a shared decision after timely communicating about the decision and the options, Defendant, Russell Builta,

---

[69] *Estate of Walker v. Stefan*, 160 A.3d 1165, 1172 (D.C. 2017) (quotation marks and brackets omitted).

shall have final decision making authority, so long as that decision is in the minor child's best interest.

The trial court found that both Ms. Guzmán and Mr. Builta had violated the requirements of the foregoing paragraph. Ms. Guzmán, the court said, "frustrated the established process for legal decision making" most seriously in connection with the parties' disagreement over which school E.A. should attend. The court found that Mr. Builta consulted Ms. Guzmán as required, they could not reach an agreement, Mr. Builta then "acted appropriately" in exercising his final decision-making authority by enrolling the child at the school he preferred, and Ms. Guzmán then "interfered with and obstructed" that change. She "violated the joint legal custody provisions . . . on multiple other occasions as well," the court found, "such as when she consistently and repeatedly emailed school administrators about the minor child but did not copy [Mr. Builta] or share that information with" him.[70] The court also was "very troubled" by Ms. Guzmán's unilateral decision to take E.A.

---

[70] The court found, among other things, that

> [Ms. Guzmán's] emails to the school about the minor child and about this litigation, many of which did not include [Mr. Builta] even though he shares joint legal custody with her, discredit her testimony that she has tried to be inclusive. [Ms. Guzmán] communicated with the school about the litigation and the child and did not include [Mr. Builta]. [Ms. Guzmán] has been actively working behind the scenes at the child's school to exclude and undermine [Mr. Builta] and [his] role as the child's other parent.

overseas to Puerto Rico over the Christmas holiday break, "during a global pandemic," and without informing Mr. Builta.

As for Mr. Builta, the court found that he had not violated or abused his tie-breaking authority, but it found that he, too, had "acted in multiple ways that violated the joint legal custody provisions" of the divorce decree. These included arranging for E.A. to be assessed by a social worker and seen by a psychotherapist to address his behavioral issues, without first discussing these referrals with Ms. Guzmán, and failing to keep Ms. Guzmán timely apprised of his changes of address and other pertinent information.

The trial court considered whether the parties' frustration with the established process for legal decision making constituted a substantial and material change of circumstances warranting modification of the custody arrangements in the best interest of the child, and decided that it was not. For one thing, the court said, this uncooperative behavior was "not a change at all," but rather a continuation of the parties' conduct vis-à-vis each other leading up to the entry of the divorce decree in 2018. Second (and perhaps most importantly), the court found with ample support in the evidence that despite their difficulties with each other, Ms. Guzmán and Mr. Builta each had "a strong, positive relationship with the minor child," and that "moving away from a 50/50 custody schedule would harm those relationships

unnecessarily."[71]  "By all accounts," the court said, "the child is fine and thriving."

The court further found that "the parties often have been able to successfully

communicate and make decisions" in EA's best interests.[72]  The "appropriate

remedy," the court concluded, was not to modify legal custody, but to enforce

compliance with the legal custody provisions of the divorce decree.

Having reached that conclusion, the court acknowledged that the provision in

the 2018 Final Order regarding legal custody (quoted above) was "vague as to what

rises to the level of having to notify the other party."  To that end, the court clarified

the provision to read in as follows (substantive changes italicized):

> When faced with a decision regarding the minor child's
> safety and general welfare, the parties are required to
> timely communicate about the decision and any options,
> including which option(s) is/are in the minor child's best
> interest.  *Timely communication is defined as giving the
> other party at least one week prior to any action being*

---

[71] The court also specifically found that Mr. Builta's remarriage did not create "a substantial and material change that should affect custody of [E.A.]"  "If anything," the court found, Mr. Builta's wife "has clearly made significant efforts to care for [E.A.], treat him exactly the same as she would her own biological children, and establish an environment that is appropriate given his multi-racial background, including efforts on her part to support his Black and Brown heritage.  In short, she very clearly loves him."

[72] The court took note of, and was impressed by, the parents' ability to set aside their hostility and work cooperatively in E.A.'s best interest when, during the course of the hearing, E.A. injured himself and needed medical attention.  The court attributed the parents' "acrimony and dysfunction" in communicating with each other "primarily" to their "tit-for-tat actions and win-at-all-costs litigation strategy."

*taken.* The parties are then required to try to reach a shared decision. If, and only if, the parties are unable to reach a shared decision after timely communicating about the decision and the options, Defendant Russell Builta shall have FINAL DECISION MAKING AUTHORITY, so long as that decision is in the minor child's best interest, *whether or not that decision is also in the best interest of the parties or other family members. It is further*

*ORDERED, that, except in cases of an emergency where the parties do not have time to communicate with each other, if a decision has been made (in accordance with the procedure listed above) for the minor child to obtain therapy or other mental health care, the parties must both agree on who that mental health care provider will be. Neither party shall have final decision-making authority on this narrow issue, and the parties must express their approval in writing. Written approval may be via email or text message. It is further*

. . . .

*ORDERED, that if either party wishes to travel with or send the minor child more than 100 miles away from the District of Columbia, that party must give at least 14 days of notice to the other party. That notice must include: (1) where the minor child is traveling, including all airports the minor child will be using; (2) where the minor child will be staying, including postal addresses and at least one phone number for an adult who can be reached at that residence/commercial location; and (3) the name of all individuals with whom the minor child will be staying. Either party who wishes to engage in such travel is strictly responsible for making sure that the minor child is returned on time for the custody exchange. It is further*

*ORDERED, that if either party wishes to change the residence in which they will live with the minor child, that party must provide their new address to the other party at least 30 days prior to the move (or as much time as*

> *possible if it is not possible to give that information at least 30 days prior to the move).  It is further*
>
> *ORDERED, that if either party seeks to move with the minor child more than 100 miles from the District of Columbia, that party shall first have to file a motion for a hearing, pursuant with [sic] Estopina v. O'Brian, 68 A.3d 790 (D.C. 2013), unless both parties have mutually approved in writing to [sic] the change in residence. Written approval may be via text message or email.*

The court did not find that this added language was justified or necessitated by a substantial and material change of circumstances.  As we have said, such a finding is normally required to support a modification of a child custody award.  However, for the most part, the above additions do not reallocate custody between Mr. Builta and Ms. Guzmán or change the particular custody arrangements themselves; they merely clarify the vague requirement of timely communication between the parents about decisions relating to E.A.'s safety and general welfare.  The desirability of such clarification was apparent in light of the difficulties both parents had in complying with the timely communication requirement.  We see no reason to condition clarifications like these on a predicate showing of a substantial and material change in circumstances bearing on custody.[73]  On appeal, Mr. Builta

---

[73] We perceive that two of the above modifications ordered by the court arguably do impinge on the custodial arrangements:  the requirement that the parents must agree on the choice of any mental health care provider for the child, which is a limitation on the final decision making authority otherwise given to Mr. Builta; and the requirement of a court hearing if the parents disagree about a proposed long-

has not objected to any of the above amendments.  Ms. Guzmán objects to only one of them, namely, the requirement that both parents notify each other before embarking on long-distance travel with E.A.  She argues that the trial court lacked the authority to include this requirement given its finding that there had not been a substantial and material change in circumstances.  In our view, such a finding was not necessary as the court did not alter the child custody arrangements or the parties' respective custodial roles and responsibilities.  Rather, the court merely enforced each parent's existing obligation to timely communicate decisions regarding the minor child's safety and general welfare.

For the reasons that the trial court gave, we are satisfied that the court did not abuse its discretion or otherwise commit reversible error in declining to find that Mr. Builta's noncompliance with the legal custody provision amounted to a substantial and material change of circumstances warranting the drastic changes in legal and physical custody that Ms. Guzmán requested.  "Courts are aware of the danger that

---

distance relocation with the child.  Neither parent has objected to these particular provisions, however.  We note that the former requirement was triggered by Mr. Builta's unilateral engagement of a therapist for E.A. without Ms. Guzmán's consent, and was designed to protect her interests.  As for the latter requirement, if either parent proposed to move with E.A. more than 100 miles from the District of Columbia without the other parent's approval, we have no doubt that it would be a substantial and material change of circumstances justifying consideration by the court of the reasons for the move and the non-consenting parent's objections.

children will be disturbed by changes in custody and are generally reluctant to modify existing custody arrangements."[74]   In the present case, given the strong reasons the court identified for preserving E.A.'s existing relationship with each parent, the parents' mutual noncompliance with their duties as legal custodians to consult with each other, and their demonstrated ability to fulfill those duties to meet the child's needs, we hold that the court exercised its discretion appropriately by choosing an alternative remedial measure that was far less drastic and potentially detrimental to the best interests of E.A.   It was reasonable for the trial court to conclude that "sustaining the validity of the original agreement between the parties" and enforcing it would accomplish its goals and be in the child's best interests.[75]

### C. Other Child Custody Modifications

Ms. Guzmán challenges two other custody-related modifications the trial court made in its Second Trial Order, claiming that they were not supported by changed circumstances.   One of those modifications was to the shared physical custody schedule in the Consent Agreement that was incorporated but not merged in the 2018 Final Order.   The schedule provided for exchanges of custody to occur on

---

[74] *Rice v. Rice*, 415 A.2d 1378, 1383 (D.C. 1980) (quoting Clark, *Law of Domestic Relations* § 17.7, at 600 (1968) (brackets omitted)).

[75] *Id.* at 1384.

Wednesdays after the end of school. Mr. Builta requested the court to change the exchange day and time to Monday mornings, claiming this would be more convenient for everyone. Although the court found that the inconvenience of the Wednesday exchanges did not rise to the level of a substantial and material change, it granted Mr. Builta's request, reasoning that the change to Monday mornings "would also not be a substantial and material modification to the award of custody" and would not prejudice either parent. Ms. Guzmán objects to the change and argues that, in the absence of a substantial and material change in circumstances, the trial court lacked authority to grant it. Under this court's precedents, we are constrained to agree with her notwithstanding any apparent lack of prejudice to either side or to the child.[76] We reverse the trial court's decision on this point.

Ms. Guzmán also challenges the trial court's grant of Mr. Builta's request to prohibit her from attending E.A.'s school during his scheduled custodial time. Specifically, Mr. Builta asked the court to enter an order barring the non-custodial

---

[76] *E.g.*, *Downing v. Perry*, 123 A.3d 474, 481 (D.C. 2015) (reiterating that the court can modify custody arrangements to which the parties have agreed only "if it finds (1) that there has been a change in circumstances which was not foreseen at the time the agreement was entered, and (2) that the change is both substantial and material to the welfare and best interest of the children"). Ms. Guzmán does suggest in her brief, however, that the change to Monday is undesirable because it may conflict with or complicate the provisions in the custody agreement concerning custody over the winter holiday schedule.

parent from attending or visiting the school during the custodial parent's custodial time (with exceptions for special events like school plays or ceremonies) without the custodial parent's consent. Ms. Guzmán, who volunteered as a room parent and was actively involved in school activities and the PTA (for which she served as a Vice President), opposed this request.

There had been a brief unpleasant confrontation at the school on one occasion in 2019 (three years earlier) when Ms. Guzmán encountered Mr. Builta and his wife there, and Mr. Builta also complained about Ms. Guzmán's unshared communications with school administrators. But there was no other evidence that Ms. Guzmán's volunteer activity at the school was detrimental to E.A. or his relationship with his father and stepmother, or that Ms. Guzmán took advantage of her presence in the school for such activity to undermine Mr. Builta's custodial rights. So far as appears, moreover, Mr. Builta had occasion to visit the school only rarely, so the likelihood of further confrontations there with Ms. Guzmán was not demonstrated.[77] The court granted Mr. Builta's request, however, reasoning that he was "simply asking for his own space and time to interact with the school,

---

[77] The trial court did not dispute Ms. Guzmán's assertion that its bar order precluded her "from volunteering or helping at the school in the 99% of occasions when Mr. Builta would not be there anyway, based on his discomfort in the 1% of occasions he might actually attend" events there.

unencumbered by [Ms. Guzmán's] physical presence (and inappropriate behavior) at the school during his custodial time." Thereafter, when the court denied Ms. Guzmán's motion to reconsider, it said that the purpose of the bar order was to forestall "the risk of placing the minor child once again in the middle of an intra-family feud—especially in front of his peers and schoolteachers."

While the trial court's intentions were benign, we agree with Ms. Guzmán that the court erred in granting the motion to bar her from E.A.'s school whenever E.A. was in Mr. Builta's custody under the parties' schedule. The court cited no legal basis for its order, and we are not aware of one. Nothing in the parties' physical custody agreement supports the order, and it appears in tension with Ms. Guzman's joint legal custody of E.A.—a status that includes, among other things, "the right" to make decisions regarding E.A.'s education, access E.A.'s educational records, and speak with and obtain information about E.A. from school officials and counselors.[78] To the extent the barring order may be characterized as a modification of, or restriction on, Ms. Guzmán's legal and/or physical custody of E.A. (which was not how the court viewed it[79]), it is not supported by any showing of an unforeseen

---

[78] *See* D.C. Code § 16-914(a)(1)(B)(i).

[79] Acknowledging that there had been no material or substantial change supporting a modification of custody, the trial court stated that its grant of Mr. Builta's motion to limit Ms. Guzmán's presence at the school "was not meant to

substantial and material change in circumstances, or that Ms. Guzmán had used her presence at E.A.'s school as an opportunity to assert custody over the child in contravention of Mr. Builta's custodial rights or to interfere with his rights, or of a need to bar her from the school for E.A.'s protection or otherwise in his best interest. In general, while a court has discretion to modify the child custody provisions of a divorce decree, its power to do so is limited and any modification must be supported by its findings and rationally related to the changed circumstance it purports to counter. That is, the modification must be "reasonably calculated to promote the child's best interest and welfare, which is the controlling consideration."[80] Because this standard was not satisfied here, we must vacate this part of the trial court's order.

## IV. Remaining Issues

Ms. Guzmán raises several other issues that we address briefly as follows.

### A. The Trial Court's Finding that Ms. Guzmán "Acted in Contempt" of the Custody Scheduling Provisions of the Parties' Consent Agreement

---

modify the custody (or visitation) schedule in place, but to set a boundary between the parties for the occasions not specifically addressed in the First Trial Order." The court viewed its restriction on Ms. Guzmán's presence at E.A.'s school as "a minor provision that facilitates, rather than changes, the existing custody." We think that characterization minimizes the impact of the order, which we consider a substantial infringement of Ms. Guzmán's liberty and parental authority.

[80] *Rice*, 415 A.2d at 1383 (quotation marks omitted).

The parties' Consent Agreement contains a schedule for each parent to share joint physical custody of E.A. on an equal basis, alternating custody weekly subject to special rules for holidays and the summer months.  As pertinent here, the Consent Agreement provided that E.A. would spend the Christmas Holiday (defined as the Wednesday of or before Christmas through the following Wednesday) with Ms. Guzmán in odd years and with Mr. Builta in even years.  The agreement further provided that Ms. Guzmán would have E.A. with her every Three Kings Day— specifically, every January 5 starting at 1:00 p.m. until January 6 at 7:00 p.m.  And the agreement provided for the "regular access schedule" to "resume without adjustment following" any holiday (including the Christmas Holiday period and Three Kings Day).

This agreement therefore apparently provided for Ms. Guzmán to have uninterrupted physical custody of E.A. for a three-week period surrounding Christmas in 2021, from December 15, 2021, to January 6, 2022.  It was during this period that Ms. Guzmán took E.A. with her to visit family in Puerto Rico.  While they were there, Mr. Builta—believing Ms. Guzmán was not in compliance with the agreed-upon schedule—filed an emergency motion to hold her in contempt of the court's divorce decree.  Mr. Builta requested that the court sanction Ms. Guzmán by awarding him costs and attorney's fees.  The trial court ruled that Ms. Guzmán "did act in contempt" of the 2018 Final Order (according to the court, by not returning

E.A. to Mr. Builta on December 29, 2021, the first Wednesday following Christmas). However, because E.A. had been "returned" and the parties were again complying with the custody schedule, the court chose not to formally "hold" Ms. Guzmán in contempt or sanction her in any way.

Ms. Guzmán contends on appeal that the trial court abused its discretion in finding her in contempt. She argues that the court misconstrued the scheduling provisions of the Consent Agreement, and that, in any event, contempt was not an available remedy because the agreement was not merged into the Final Order.[81] In response, Mr. Builta argues that the issue is moot, inasmuch as the court specifically did not "hold" Ms. Guzmán in contempt and desisted from sanctioning her. Ms. Guzmán responds that the court's erroneous contempt finding could be brought up in potential future custody disputes and "weaponized[d]" against her.

---

[81] *See D.D. v. M.T.*, 550 A.2d 37, 48 (D.C. 1988) ("A settlement which has been reduced to a consent judgment is an order of the court, and subject to enforcement like any other court order. In general, however, a settlement agreement which has been approved and signed by the court, but which has not been framed as an order or a judgment, remains an agreement only, and may be enforced by an action for breach of contract but not by contempt." (internal citation omitted.)); *see also* Diane M. Brenneman, Linda J. Ravdin, Anne Marie Jackson & Sarah J. Zimmerman, *Domestic Relations Manual for the District of Columbia* § 10.08[1] (2023 ed.) ("An unmerged contract may not be enforced by contempt.") (hereinafter, "Brenneman *et al.*, *Domestic Relations Manual*").

Notwithstanding Ms. Guzmán's concern, the law is settled that we do not have appellate jurisdiction to entertain her challenge to the finding that she acted in contempt of the Final Order.[82] We recently explained this as follows:

> "This court has consistently held that 'where the trial court has imposed no remedial or coercive sanction conditioned upon compliance with [a] contempt order, an adjudication of civil contempt lacks the certainty, specificity, and finality essential for judicial review.'" "[T]he embarrassment and unpleasantness of having been found in contempt, without more, will not create a justiciable controversy, and . . . an individual so adjudicated does not have the right to appeal simply to clear his or her name."[83]

Lacking jurisdiction, we must refrain from addressing the merits of Ms. Guzman's objection to the court's pronouncement that she "did act in contempt" of the divorce decree.

---

[82] *See Kayode v. Midas Constr., LLC*, 312 A.3d 1229, 1232 (D.C. 2024) ("Before we may proceed to the merits, '[w]e [must] first determine whether we have jurisdiction to entertain [this] appeal[].'" (quoting *Deloatch v. Sessoms-Deloatch*, 229 A.3d 486, 488 (D.C. 2020))).

[83] *Id.* (alterations in original) (quoting *Crane v. Crane*, 614 A.2d 935, 939 (D.C. 1992) (per curiam)*, and D.D.*, 550 A.2d at 42-43 (D.C. 1988)); *see also* Brenneman *et al.*, *Domestic Relations Manual* § 18.10[1] ("An adjudication of civil contempt cannot be appealed until a sanction has been imposed. Until a sanction is imposed there is no final order.").

## B. Ms. Guzmán's Objections to Other Rulings and Findings

Ms. Guzmán objects to various other rulings and findings by the trial court. These include claims that the court erred in (1) failing to compel Mr. Builta to answer two questions at his deposition (one about his wife's income in 2019, and the other about the number of days E.A. was absent from school in 2018-19), (2) admitting into evidence school reports regarding her confrontation there with Mr. Builta, (3) denying Ms. Guzmán's request to examine Mr. Builta as a "hostile witness," and (4) observing in the Second Trial Order that E.A.'s multi-racial background was part of the reason he was enrolled in the particular charter school he attended. Whatever the technical merits of Ms. Guzmán's objections, she has not demonstrated and we do not perceive that she was prejudiced by these miscellaneous minor rulings and comments. It is well established that we will not reverse due to merely "technical errors or defects."[84]

Finally, Ms. Guzmán contends that the trial court erred by summarily denying her many claims for attorney's fees during this case's extensive pretrial litigation. Ms. Guzmán complains that the court agreed in a pretrial hearing to hear these claims

---

[84] *Liberty Mut. Ins. v. Staten*, 201 A.2d 528, 530 (D.C. 1964).

after trial but instead summarily denied them in its Second Trial Order.[85]  We find the discussion of this issue in Ms. Guzmán's brief too cursory and conclusory to enable us to evaluate her claim or perceive that the court abused its discretion.  We are not going to sift through the record and make arguments for Ms. Guzmán without her help.  That said, we note that, upon review of the record, it is not clear to us whether or to what extent the trial court's denial of attorney's fees in the Second Trial Order applied to Ms. Guzmán's pretrial litigation requests, or that those requests were meritorious.  For example, it appears that many of the claims for attorney's fees that Ms. Guzmán brings up actually were already disposed of by the

---

[85] In the pretrial hearing, Ms. Guzman's counsel mentioned that "we had agreed that we were going to do attorneys' fees after the judgment came out," to which the court replied "yes, I think we can hold attorneys' fees.  That'll be the one thing I think we can accept [sic] out."  The record—and Ms. Guzman's brief—does not expand upon this initial agreement between the parties and the court regarding attorneys' fees nor what specific attorneys' fees were being "held" beyond this brief and isolated exchange.

In its Second Trial Order, the trial court "ORDERED, that all requests for attorney's fees and costs from both parties are DENIED."  As Mr. Builta notes in his brief, there were a veritable plethora of motions filed in this case, by both sides.  In its subsequent order denying Ms. Guzmán's motion to alter or amend the Second Trial Order, the court made the following comment in denying her request for her attorney's fees and costs that she incurred in opposing Mr. Builta's contempt motion:

> The Court reminds [Ms. Guzmán] that this entire litigation has been an extremely contentious and upsetting one. Every pleading filed in the course of litigation probably has caused significant distress on either party—or both. That does not mean that the Court must award the parties attorney's fees associated with each and every motion.

trial court before trial, including her requests for attorney's fees regarding motions to quash subpoenas, her motion to compel deposition responses, and her first and second motions for contempt. Ms. Guzmán also does not provide further context to explain the exchange she reports between her counsel and the trial court, which is ambiguous and does not explicitly identify which of Ms. Guzmán's many claims for attorney's fees were to be "held" until after a judgment was released. In any event, we are remanding for further proceedings, which will afford Ms. Guzmán an opportunity to seek reconsideration of the court's summary denial of her requests for attorney's fees if she chooses to do so.

## V. Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion.

*So ordered*.